443 So.2d 546 (1983)
STATE of Louisiana
v.
Frederick KIRKPATRICK.
No. 83-KA-0734.
Supreme Court of Louisiana.
November 28, 1983.
Rehearing Denied January 6, 1984.
*550 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Marion B. Farmer, Dist. Atty., Margaret Coon, William R. Alford, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Thomas J. Ford, New Orleans, Oliver F. Johnson, Covington, for defendant-appellant.
BLANCHE, Justice.[*]
Defendant, Frederick Kirkpatrick was indicted by the St. Tammany Parish Grand Jury on March 11, 1982, for the first degree murder of Steve Joseph Radoste[1], a violation of R.S. 14:30. A jury of twelve unanimously found the defendant guilty of the crime charged. Following the sentencing hearing, the jury recommended unanimously that the defendant be put to death, and the trial court sentenced him accordingly. In reaching its conclusion, the jury found the existence of the following statutory aggravating circumstances: (1) the defendant had been engaged in the perpetration or attempted perpetration of an armed robbery or simple robbery at the time the victim was killed, and (2) the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4, §§ (a), (g). In appealing his conviction and sentence, the defendant has assigned twelve errors. The twelfth assignment is a request for a review for errors patent which this Court has completed, being satisfied that there are no errors patent on the face of the record.

FACTS
On the night of January 27, 1982, the defendant and Charles Faulkner were in the home of Steve Joseph Radoste, who lived alone in the Pearl River area of St. Tammany Parish. During the night Mr. Radoste was killed from having been struck in the head twice with a heavy glass object, stabbed twice, and shot in the head. The house was then robbed of several movables and the decedent's truck was taken. At the time of his death the victim was nursing an injured ankle. His crutch was found in the room next to his naked, battered body.
A forensic scientist with the Louisiana State Police described the murder scene at trial. The living room was in disarray with quite a bit of blood splattered on the furniture and carpet. The victim's naked body was lying on the floor with a butcher knife stuck into his chest to the hilt. A second knife wound was visible on the victim's lower abdomen through which a piece of the victim's intestine was protruding. There was blood from both knife wounds on and around the body. In addition, there were wounds to the victim's head. Two pillows which had been placed over the right side of the victim's head were bloodied and contained a bullet hole. Blood was also found smeared on the floor and walls of the bedroom.
Dr. Charles Crumpler performed an autopsy on the victim and made a determination as to the cause of death. He described three major types of wounds found on the victim's body. There were areas of torn skin and multiple bruises to the victim's head. There were two sharply precise stab *551 wounds on the front of the body; one in the lower left chest, and one in the upper abdomen and midline. Finally, there was a gunshot wound on the right side of the head about an inch above the ear. Dr. Crumpler stated that the gunshot wound was the immediate cause of death, but added that the stab wounds would have caused death within a few hours as a result of slow internal bleeding.
On the afternoon of January 28, 1982, the Meridian (Mississippi) Police Department discovered the burned out remains of a late model pickup truck just south of Meridian, Mississippi. Acting upon information received, they arrested the defendant for the arson of the truck. At the time of the arrest, officers observed a number of items stacked in the defendant's home, including two televisions, a wine rack, and leather jackets, later identified as belonging to the victim. The officers, however, made no seizure at this time.
After being advised of his Miranda rights, the defendant made a voluntary statement admitting that he and Charles Faulkner had driven the truck out to a remote area and that the defendant had watched as the truck was burned. He also stated that Charles Faulkner was in possession of a .22 caliber Derringer.
On January 29, 1982, the Meridian Police received a teletype from the St. Tammany Parish Sheriff's Office identifying the vehicle identification number on the burned truck as that belonging to a truck owned by Steve Radoste. St. Tammany Parish Sheriff's Deputies then went to Meridian to examine the truck. The truck was identified and a search warrant was issued to search the defendant's house. Pursuant to the search warrant, several items were seized at the defendant's home which were subsequently identified as belonging to the victim by members of the victim's family. The defendant was then arrested for the murder of Steve Joseph Radoste.
Charles Faulkner was also later apprehended. A .22 caliber Derringer was surrendered to the authorities by a cousin of Charles Faulkner, who stated that Faulkner had given the gun to him. Tests revealed that the bullet removed from the victim's head was fired from this same .22 caliber Derringer. Merrill Koenig, a long time friend who had discovered the victim's body, identified the Derringer as one he had given to the victim.
Both the defendant and Charles Faulkner waived extradition and were returned to Louisiana to stand trial pursuant to the March 11, 1982 indictment. The cases were severed for trial and each was tried separately. The defendant was found guilty and received the death penalty. Charles Faulkner was found guilty and received a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence.

Assignment of Error No. 1
The defendant contends that the trial court erred in refusing to appoint another attorney to represent him when his court-appointed attorney realized that he had rendered legal services to members of the victim's family.
In the judge's chambers prior to the start of the third day of the trial, the court appointed defense counsel, Thomas J. Ford, Jr., informed the court, under oath, that the preceding evening he had realized that he had rendered legal services for some members of the victim's family in the past.
Ford did not state that he felt that this knowledge would interfere with his representation of the defendant. In fact, on oral arguments to this Court, Ford expressed his reaction to this revelation as an immediate concern which cost him a semi-sleepless night, but which had no effect upon his further representation of the defendant. Ford stated that, although he had a professional relationship with some members of the victim's family, he had been introduced to the victim only briefly, and could not remember ever speaking to him.
After the defendant testified in chambers as to his feelings with respect to Ford's further representation of him, the trial judge denied the defendant's motion to dismiss *552 Ford as counsel of record and appoint another attorney.
The right of every criminal defendant to have the assistance of counsel is basic to our legal system. U.S. Const. amend. VI; La. Const. art. I, § 13. This right is preserved to an indigent defendant through the requirement that an attorney be appointed to represent him. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Harper, 381 So.2d 468 (La.1980). However, an indigent defendant does not have the right to have a particular attorney appointed to represent him. State v. Harper, supra; State v. Rideau, 278 So.2d 100 (La.1973).
The issue of conflicting loyalties usually arises in the context of joint representation. Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1976); State v. Kahey, 436 So.2d 475 (La. 1983). It can also arise where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney. United States v. Morando, 628 F.2d 535 (9th Cir., 1980); United States v. Partin, 601 F.2d 1000 (9th Cir., 1979).
Multiple representation is not per se illegal and does not violate the Sixth Amendment to the U.S. Constitution (or Article 1, Section 13 of the Louisiana Constitution) unless it gives rise to a conflict of interest. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); Holloway, supra. If a defendant establishes that an actual conflict of interest adversely affected his lawyer's performance, he has demonstrated a violation of his Sixth Amendment rights under the U.S. Constitution and his Article I, Section 13 rights under the Louisiana Constitution. Cuyler, supra; State v. Franklin, 400 So.2d 616 (La.1981).
In the present case, no member of the victim's family appeared as a witness so as to cause a conflict of interest. In addition, defense counsel's familiarity with the victim's family was so attenuated that he had to question the individual that he thought he recognized to confirm that she was related to the victim. With respect to the victim, counsel did not know him, though he did venture that he probably had met him.
Under these facts, we find there was no conflict of interest. In any event, there was a total failure on the part of the defendant to in any way establish that the defense counsel's former representation of some members of the victim's family had any effect whatsoever on counsel's performance on the behalf of the defendant.
This assignment is without merit.

Assignment of Error No. 2
The defendant contends that the trial court erred in both verdict and sentence due to the prosecutor's opening statement to the effect that the defendant was not the murderer.
Defense counsel's brief does not direct this court to the language complained of in the prosecutor's opening statement. Reviewing the record, we can only presume that defense counsel is referring to the prosecutor's statement that "Freddie Kirkpatrick hit Mr. Radosti with a vase type glass object; that he stabbed Mr. Radosti several times; and that Charles Faulkner shot Mr. Radosti in the head." (Tr., Vol. II, p. 425, 426).
Initially, we note that there is no conclusive evidence as to who actually shot Mr. Radoste. Later testimony by Dr. Charles Crumpler, who performed the autopsy on Mr. Radoste, indicated that the immediate cause of death was a gunshot wound to the head. Dr. Crumpler did, however, express his belief that the stab wounds would also have been fatal. Commenting on the fatal nature of the stab wounds, he stated that "... the mode of death resulting from that would have been bleeding, internal or external bleeding, probably internal bleeding slowly." (Tr. Vol. III, p. 524).
In Emmund v. Florida, ___ U.S. ___, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court decided that the imposition of the death penalty on a *553 person who aids and abets a felony in the course of which a murder is committed by others is a violation of the Eighth and Fourteenth Amendments of the U.S. Constitution, if that person does not himself kill, attempt to kill, or intend to kill. 102 S.Ct. at 3379. (emphasis added.)
Here, there is ample evidence that the defendant both attempted and intended to kill Steve Radoste. The defendant struck Mr. Radoste over the head twice with a heavy glass object. The defendant then took a butcher knife and stabbed Mr. Radoste in the abdomen. He then plunged the butcher knife into Mr. Radoste's chest to the hilt and left it there. There is no conclusive evidence as to who actually shot Mr. Radoste. Dr. Crumpler confirmed that the stab wounds would have caused death without the shooting of the bullet through Mr. Radoste's brain. The telephone lines were cut and Mr. Radoste's house was looted and robbed by the defendant and Charles Faulkner. There is no doubt that the defendant intended to kill Mr. Radoste and rob him. As the state carried their burden of proving beyond a reasonable doubt that the defendant attempted and intended to kill the victim, the defendant may not rely upon Emmund v. Florida, supra, for relief.
Review of this court has, in the past, been limited to a determination of the existence of some evidence of each essential element of the crime. State v. Sonnier, 380 So.2d 1 (La.1979); State v. Banks, 362 So.2d 540 (La.1978). A conviction will be set aside on appeal if there is no evidence of an essential element. State v. Sonnier, supra; State v. Madison, 345 So.2d 485 (La.1977). Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of review is now to consider whether there was sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt.
Under the above standards, the state has adduced sufficient evidence to justify a conviction of first degree murder. Additionally, it has been shown that the imposition of the death penalty under these facts was not violative of defendant's Constitutional rights as set out in Emmund v. Florida, supra.
This assignment is without merit.

Assignment of Error No. 3
The defendant contends that the trial court erred in denying the defendant's motion to suppress his confessions and inculpatory statements.
This assignment of error was neither argued nor briefed. Assignments of error neither argued nor briefed are generally considered abandoned. State v. Lindsey, 404 So.2d 466 (La.1981); State v. Sonnier, 379 So.2d 1336, an original hearing (La.1979). However, in cases where the death penalty is imposed, this Court reviews assignments of error not briefed as a matter of policy. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Berry, 391 So.2d 406, on original hearing (La.1980); State v. Jones, 332 So.2d 466 (La.1976).
The thrust of defendant's objection is that he was induced into making inculpatory statements by Ernest M. Jackson, Chief Deputy of the Lauderdale County (Mississippi) Sheriff's Office, who controlled whether or not the defendant's girlfriend (whom Jackson presumed to be defendant's wife) would be allowed to visit the defendant.
On this ground, the assignment has no merit. There is no evidence to support such a finding. Deputy Jackson had known the defendant as a result of his having been a guest in the jail over the last 8 years and the defendant asked if his girlfriend could visit him. Jackson gave his permission and on a subsequent visit to the jail a few days later asked the defendant whether his girlfriend had visited him. Upon learning that she had not, Jackson then suggested that the defendant use the phone to call her.
This gesture of permitting the defendant to use the phone to call his girlfriend was not offered as any inducement to obtain the statement from the defendant. Deputy *554 Jackson had not been involved in the initial investigation of the case and any rapport he had with the defendant came as a result of the defendant's prior incarcerations. All of the voluntary statements and confessions made to Jackson were not the result of any questioning by Deputy Jackson but were initiated by the defendant when he asked Deputy Jackson if the police had found the "old man's pocketbook". When Jackson replied that he had not, the defendant "indicated that he could take (Jackson) and show (him) where it was hid." Jackson then arranged to have the defendant show them the location of the wallet.
In our review of the record we have noted that after the defendant voluntarily offered to show Deputy Jackson where the wallet had been hidden, there was no further warning given the defendant of his Miranda rights. We also find from the record that on two prior occasions defendant had been advised of these rights. The first time was when he was arrested for arson. At the motion to suppress Chief of Detectives Hatcher testified that he orally advised defendant of his rights at that time and after having transported him to the police station had him sign a form explaining his Miranda rights. The next time was when defendant was arrested for the murder of Mr. Radoste. Chief Hatcher identified the rights form executed at that time which was identical to the first form that the defendant signed. Additionally, it is noted that this defendant is no neophyte to the legal system, having been jailed several times in the past eight years for varying offenses. We find that the defendant was fully aware of his Miranda rights. At no time did the defendant invoke any of these rights.
In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the United States Supreme Court examined their opinion in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and reiterated that "the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." 446 U.S. at 300, 100 S.Ct. at 1689. Thus, Miranda safeguards are triggered by custody plus interrogation. Where there is custody but no interrogation, Miranda is not triggered. In this case, we find that the inculpatory statements by the defendant were not made pursuant to any direct interrogation. Further, they were not the product of a conversation that was "reasonably likely to elicit an incriminating response" from the defendant. 446 U.S. at 301, 100 S.Ct. at 1689.
This assignment is without merit.

Assignment of Error No. 4
The defendant contends that the trial court erred in admitting into evidence certain gruesome photographs of the victim's body. The four photographs objected to were admitted during the guilt phase of the trial.
The four color photographs depict the murder scene as it was found by the St. Tammany Parish Sheriff's Department. They show a living room in disarray with the nude body of the victim lying on his back with two pillows partially covering his head. There is blood on the pillows and the surrounding furniture. A yellow towel is beneath the upper torso and wrapped over the left arm. A blood stained white towel is lying across the victim's neck. There is a wound to the victim's lower abdomen with a small portion of intestine protruding, blood visible on the victim's head, and a large knife buried almost to the handle in the lower left portion of the victim's chest. There are papers and furniture cushions strewn about the room. A blood stained crutch is visible. Of the approximately forty-two photographs introduced into evidence, these are the only four that show the victim's body.
It is well-settled that the admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. State v. Brogdon, 426 So.2d 158 (La.1983); State v. Perry, 420 So.2d 139 (La.1982); State v. Lindsey, *555 404 So.2d 466 (La.1981). Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. State v. Lindsey, supra; State v. Bodley, 394 So.2d 584 (La.1981); State v. Landry, 388 So.2d 699 (La.1980).
The four photographs admitted at the guilt phase of the trial were relevant to show the identification of the victim, the location of the body, the manner of death, the close proximity of the crutch to the victim, and the specific intent of the defendant to kill the victim. When the probative value of the photographs toward the manner of death and the specific intent of the defendant to kill the victim are balanced with the small likelihood that the jury was inflamed[2] by viewing these pictures, we find that the probative value of the photographs outweighs the possible inflammatory effect. State v. Lindsey, supra.
This assignment is without merit.

Assignments of Error Nos. 5 and 7
The defendant contends that the trial court erred in denying defendant's motion challenging the death qualification of the jurors and in granting the state's four challenges for cause under La.C.Cr.P. art. 798(2).
We construe counsel's motion and remarks in connection therewith to complain that La.C.Cr.P. art. 798(2)[3], which gives the state the right to excuse jurors who would automatically vote against the death penalty without regard to any evidence that might be developed at trial, forces on the defendant a partial jury by virtue of the inherent nature of the statute; that such a dismissal denies defendant the right to a jury comprised of a true cross section of the community; and finally, that such juries deny the defendant equal protection of the law.
La.C.Cr.P. art. 798(2) was amended to conform with the decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), wherein the United States Supreme Court found that there was no constitutional bar to excluding jurors who stated in advance of trial that they could not even consider returning a verdict of death or that their attitude about the death penalty would prevent them from making an impartial decision as to defendant's guilt. State v. Perry, 420 So.2d 139 (La.1982); State v. George, 371 So.2d 762 (La.), cert. denied, 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325 (1979). In a recent case involving this issue, the United States Supreme Court stated, "[w]e repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." Adams v. Texas, 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980).
There is no merit to defendant's contention that his constitutional right to be tried by a jury selected from a fair cross-section of the community has been violated when prospective jurors have been properly excluded in compliance with La.C.Cr.P. art. 798(2) and Witherspoon v. Illinois, supra, *556 as was done here. State v. Kelly, 375 So.2d 1344 (La.1979).
A review of the voir dire examination reveals that the four excluded prospective jurors stated in advance of trial that they could not consider returning a verdict of death. Therefore, the jurors were properly excused in compliance with La.C.Cr.P. art. 798(2) and Witherspoon v. Illinois, supra.
Assignments of Error Nos. 5 and 7 are without merit.

Assignment of Error No. 6
The defendant contends that the trial court erred in denying his motion for an individual and sequestered voir dire. Defense counsel argues that the voir dire conducted in the presence of other potential jurors enabled persons seeking to avoid jury service to learn avoidance techniques.
There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. The manner in which the veniremen are called and the scope of examination are left to the court's discretion. La.C.Cr.P. art. 784; Id., comment (c); La.C.Cr.P. art. 786; State v. Willie, 410 So.2d 1019 (La.1982). The burden is on the defendant to show that the court abused its discretion in refusing to sequester the venire at voir dire. State v. David, 425 So.2d 1241 (La.1983); State v. Watson, 423 So.2d 1130 (La.1982); State v. Willie, 410 So.2d 1019, supra. Whether there were any jurors that learned from others during the voir dire how to escape jury service is a matter difficult of proof and, in our view, an assertion made primarily on conjecture. From our independent review of the record, we are convinced that the defendant failed to carry his burden of proving an abuse of discretion by the court. Defendant has failed to prove prejudice on the part of the jurors.
This assignment is without merit.

Assignment of Error No. 8
The defendant contends that the trial court erred in refusing defendant's motions for a mistrial and to quash the indictment based upon the state's opening statement. At the end of the state's opening statement, defense counsel moved for a mistrial based upon the state's reference to the defendant's arrest by Meridian (Mississippi) police for the arson of Mr. Radoste's truck. Defense counsel also moved to quash the indictment alleging that the state had failed to specifically state that defendant had committed armed or simple robbery at the time Mr. Radoste was killed. (Tr., Vol. II, pp. 428, 429).
During his opening statement, the prosecutor stated that the Meridian Police Department originally arrested the defendant for arson of Mr. Radoste's truck. La.C.Cr.P. art. 770 states in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible:
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
An exception to this rule is made if the evidence is substantially relevant to some purpose other than to show that the accused is a bad person, therefore more likely to have committed the crime. State v. Gaston, 412 So.2d 574 (La.1982); State v. Belgard, 410 So.2d 720 (La.1982); State v. Sutfield, 354 So.2d 1334 (La.1978). The underlying policy of protecting the accused against unfair prejudice dictates that, even though the evidence have an independent relevance, the trial judge must balance all *557 of the pertinent factors to determine whether the probative value of the evidence is outweighed by its prejudicial effect. State v. Sutfield, supra; State v. Prieur, 277 So.2d 126 (La.1973).
In this case, the defendant's arrest for arson was extremely relevant to show the defendant's connexity with the stolen property of the victim. One of the statutory aggravating factors argued by the State and found by the jury was that the killing took place during the perpetration or attempted perpetration of an armed or simple robbery. Any competent evidence tending to show the connexity between the defendant and the victim's stolen property is extremely relevant as to the proof of the robbery. As such, we find that the prejudicial effect of the mention of the defendant's arrest for arson of the truck is outweighed by its relevancy to the robbery of the victim. The trial court was correct in denying the motion for mistrial.
An examination of the record shows that the state, in its opening statement, set forth each element of the crime of first degree murder under R.S. 14:30 as required by La.C.Cr.P. art. 766.[4] The state, on three separate occasions[5] made mention of the robbery of the victim's possessions. The prosecutor specifically stated that, "Mr. Radosti, of course, was robbed of all the belongings that they could get in his truck." (Tr., Vol. II, p. 426). Thus, the state, in its opening, complied with the requirements of La.C.Cr.P. art. 766.
This assignment is without merit.

Assignment of Error No. 9
The defendant contends that the trial court erred in allowing the state to display many items of physical evidence within the view of the jury when the state did not introduce them all into evidence.
The defendant does not identify, either by brief or in the record, what the unintroduced items of evidence were or their relative number.[6] The defendant makes no showing of prejudice due to the court allowing this procedure. The defendant states only that the procedure "served to further inflame the jurors and to influence them in such a way as to make them believe that there was much more evidence in the State's possession." (Def.Brief, p. 6).
All matters pertaining to the conduct of the trial are within the sound discretion of the trial judge. Necessarily, the trial judge is given wide discretion in controlling the conduct and orderly process of the trial. He has the authority and duty to require that the trial be conducted with dignity and in an orderly and expeditious manner. La. Const., Art. 5, § 1; La.C. Cr.P. art. 17; State v. Chaisson, 425 So.2d 745 (La.1983); State v. Passman, 345 So.2d 874 (La.1977); State v. Reeves, 263 La. 923, 269 So.2d 815 (La.1972).
In this case, the trial judge decided that the most practical way of handling the evidence was to have the state introduce those items which it intended to introduce and then remove the remainder.[7] The defendant has made no showing that this was an abuse of the trial judge's broad discretion in this area.
This assignment is without merit.

Assignment of Error No. 10
The defendant contends that the trial court erred in allowing the state to *558 introduce results of scientific analysis that were not provided to the defendant prior to trial.
The record reflects that defendant's pretrial motion for discovery was answered by the state. (Tr., Vol. I, p. 119). The minute entry for June 8, 1982, states that defense counsel informed the trial court that he was satisfied with these answers. (Tr., Vol. I, p. 6). At oral argument defense counsel stated that the information that he sought was the results of certain blood tests. The samples were drawn by St. Tammany Parish Sheriff's Office officials and forwarded to the Louisiana State Police Crime Lab in Baton Rouge for analysis. The thrust of defense counsel's objection is that he was not forwarded the results in time to incorporate them into his trial preparation. Counsel admitted, however, that the state did not receive these results until the day of trial or the day before trial.
It appears that defendant's complaint runs more towards an attack on the procedures to gain scientific analysis of evidence incorporated by the St. Tammany Parish Sheriff's Office rather than a showing of prejudice to his case. An examination of the record shows that the state was afforded no advantage over the defendant with respect to this evidence.
Although we feel that the procedure utilized was inefficient and burdensome to the judicial process, from our independent review of the record, we find that this situation did not affect a substantial right of the accused. La.C.Cr.P. art. 921. We cannot say that the last minute receipt of the results of blood tests[8] impaired the defendant's ability to properly assess the strength of the state's case against him in preparing his defense. State v. Ray, 423 So.2d 1116 (La.1982); State v. James, 396 So.2d 1281 (La.1981).
This assignment is without merit.

Assignment of Error No. 11
The defendant contends that the trial court erred in refusing to explain to the jurors the meaning of "life imprisonment" under the penalty clause of R.S. 14:30, and in refusing to answer the jury's questions regarding the status of the law.
According to the judge's comments while the jury was deliberating during the sentencing phase of the bifurcated trial, the jury had included a note with its verdict on guilt. Although the judge stated that the note was to be filed into the record, that record as lodged in this court does not contain a note. The judge did, however, read the note into the record as follows: "Question one, `Life sentence, can there be parole?' Two, `Can the present law be changed with regard to the above?'"(Tr., Vol. IV, p. 945). The defendant contends that the failure of the trial judge to answer these questions presents reversible error.
The record shows that during the sentencing deliberations, in response to a second note from the jury reasserting the above questions, the trial judge brought the jury before the court and readvised them of the factors which they could take into account in deciding the sentence.[9] He *559 then sent the jury back to deliberate the sentence.
It is well settled that an instruction or comment to the jury making mention of commutation or parole possibilities on a life sentence in a capital case introduces arbitrary factors which divert the jury from their primary responsibility. Therefore, such instructions or comments are improper. State v. Brown, 414 So.2d 689 (La. 1982); State v. Willie, 410 So.2d 1019 (La. 1982); State v. Lindsey, 404 So.2d 466 (La. 1981).
In California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the United States Supreme Court, citing State v. Lindsey, supra, conceded that many states including Louisiana "... have held it improper for the jury to consider or to be informedthrough argument or instructionof the possibility of commutation, pardon, or parole." Id., ___ U.S. at ___ n. 30, 103 S.Ct. at 3459 n. 30. The opinion further notes that "[i]t is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires." Id. ___ U.S. at ___, 103 S.Ct. at 3460. The trial court was correct in refusing to explain the meaning of "life imprisonment" to the jurors.
This assignment is without merit.
For these reasons, the conviction should be affirmed.

SENTENCE REVIEW
The defendant was tried in accordance with the provisions of La.C.Cr.P. arts. 905-905.8, which provide for a bifurcated trial in capital cases. At the conclusion of the sentencing hearing, the 12-man jury returned a unanimous recommendation that the defendant be sentenced to death.
Article 905.9 of the Code of Criminal Procedure requires this court to review every sentence of death to determine if it is excessive. That article also mandates this Court to establish procedures to satisfy constitutional criteria for that review. Pursuant to this authorization, this court adopted Supreme Court Rule 28, § 1, which the legislature incorporated as La.C.Cr.P. art. 905.9.1, on Review Guidelines, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
In compliance with La.C.Cr.P. art. 905.9.1, § 3, the trial judge submitted a Uniform Capital Sentence Report. This report indicates that the defendant is a white male who was 26 years old at the time of trial. He has no children or other dependents. The Pre-Sentence Investigation Report (PSI) ordered by the trial judge prior to sentencing, indicates that the defendant has a wife and two step-sons. This discrepancy was explained during the hearing of both the guilt and sentence phases of the trial. The trial testimony shows that the defendant was not married, but lived in a common-law relationship with Caroline Wright in Meridian, Mississippi. The defendant is not the natural father of Ms. Wright's two children.
The defendant claims to have a high school equivalency degree from Meridian Junior College and medium intelligence. No psychiatric examination was performed. The report shows a sporadic and scant employment history. Both of defendant's parents are deceased. His mother died when he was 12, and his father died when he was 17.
*560 The PSI shows the defendant to have a previous conviction for grand larceny, on which he apparently violated his parole. He was dismissed from a Mississippi prison for that crime only 20 days before the discovery of the instant murder.

PASSION, PREJUDICE AND ARBITRARY FACTORS
The defendant is a white male, as was the victim. The defendant was unrelated to the victim. The record shows that the defendant had never met the victim prior to the night of the murder. The defendant was not a resident of the parish in which the murder was committed or the trial took place.
The prosecutor's argument for the death penalty was made in a non-inflammatory manner. (Tr., Vol. IV, pp. 924, 925, 930-934). The prosecutor refrained from any mention of the possibility of pardon or parole on a life sentence. State v. Lindsey, 404 So.2d 466 (La.1981).
The trial judge, as shown in Assignment of Error No. 11, above, refrained from incorporating any arbitrary factors into the jury's deliberations. State v. Brown, 414 So.2d 689 (La.1982); State v. Lindsey, supra. The judge's charge to the jury stressed that the verdict for the death penalty must be unanimous and be based upon a unanimous finding of a statutory aggravating circumstance. He further correctly charged the jury that: "Even if you find the existance of an alleged aggravating circumstance, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed." (Tr., Vol. IV., p. 936). La.C.Cr.P. art. 905.3.
Our review of the record shows that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factors.

AGGRAVATING CIRCUMSTANCES
The jury found two aggravating circumstances, to-wit: the offender was engaged in the perpetration or attempted perpetration of an armed robbery or a simple robbery, La.C.Cr.P. art. 905.4(a), and that the offense was committed in an especially heinous, atrocious, or cruel manner, La.C. Cr.P. art. 905.4(g).
The evidence fully supports the finding that the offense was committed during the perpetration of a robbery. In his testimony at trial, the defendant admitted taking numerous items from the victim's house and placing them in the victim's truck which he and Faulkner then drove to Meridian, Mississippi and burned. Coupled with the testimony of others at trial who identified the property found in the possession of the defendant as that belonging to the victim, the evidence clearly supports the jury's finding of this statutory aggravating circumstance.
The jury also found that the offense was committed in an especially heinous, atrocious or cruel manner. The victim received two blows to the head with a heavy glass object. The victim was then stabbed twice with a butcher knife, once to the lower abdomen, and once to the chest wherein the knife was left in the body. The victim was then shot in the head, which according to the testimony of Dr. Crumpler, caused immediate death. The trial judge, in the Uniform Capital Sentence Report stated that "the killing was not only uncalled for and senseless, but ... was especially heinous and attrocious (sic), and that the death penalty is called for and most appropriate."
To find that the murder was committed in an especially heinous manner, there must be evidence of serious physical abuse of the victim before death. The murder must be one that "causes death in a particularly painful and inhuman manner." State v. Taylor, 422 So.2d 109 (La. 1982); State v. Baldwin, 388 So.2d 664 (La.1980).
Here, the victim was beaten and stabbed and left bleeding on the floor before he was, out of cruelty or pity, shot in the head. The amount of blood splattered about the living room, as evidenced in the photographs, portrays the vicious and brutal *561 nature of the attack. This writer is totally convinced that this crime was committed in an especially heinous, atrocious or cruel manner. Yet, in the past, this court has divided on the "heinous" nature of stabbing and cutting offenses. See State v. Taylor, 422 So.2d 109 (La.1982); State v. Culberth, 390 So.2d 847 (La.1980).
Be that as it may, such a determination is unnecessary in this case as there was clear proof of one aggravating factor. This court has found it unnecessary for both aggravating factors found by the jury to be present in affirming death penalty convictions. State v. Narcisse, 426 So.2d 118 (La.1983); State v. Moore, 414 So.2d 340 (La.1982). The United States Supreme Court has upheld such procedures in Zant v. Stephens, ___ U.S. ___, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
Under Stephens, the death sentence is not impaired if the jury incorrectly determined that the crime was committed in an especially heinous manner. Our only inquiry is whether any evidence presented at the sentencing phase of the trial in support of the heinous nature of the crime inserted any arbitrary factors into the jury's deliberations. Here, the state, at the sentencing phase of the trial, merely entered into evidence the record of the guilt phase of the trial in its entirety. The prosecutor neither produced additional evidence of nor made additional arguments on the heinous nature of the crime. As such, we find that no arbitrary factors were inserted into the jury's deliberations in this instance.
As the evidence is sufficient to support one of the aggravating circumstances, and the production of evidence in support of the other statutory aggravating circumstance inserted no arbitrary factors into the jury's deliberations, the sentence recommended by the jury will not be set aside.

PROPORTIONALITY
Supreme Court Rule 28, § 4 mandates that the district attorney file with this Court a list of each first degree murder case in the district in which sentence was imposed and a synopsis of the facts in the record concerning the crime and the defendant. This list is reviewed by this court to determine whether the sentence in the case before us is disproportionate to the penalty imposed in similar cases. An inference of arbitrariness arises when a jury's recommendation is inconsistent with similar cases in the jurisdiction. State v. Sonnier, 380 So.2d 1 (La.1979).
The state's sentence review memorandum lists thirty-one first degree murder cases in the Twenty-Second Judicial District since January 1, 1976. There have been seventeen in St. Tammany Parish and fourteen in Washington Parish. Several of these cases involved multiple defendants, the most recent one before this Court being State v. Willie, 436 So.2d 553 (La.1983); in which the death penalty for a co-defendant in a rape/murder was affirmed.
In St. Tammany Parish, fifteen defendants were convicted of first degree murder, twelve were sentenced to life imprisonment, and three were sentenced to death. Five defendants in Washington Parish were found guilty of first degree murder, four were sentenced to life, and one was sentenced to death.
In State v. Willie, supra, Robert Lee Willie and Joseph Vaccaro dragged a young woman into a wooded area and raped her. Willie then slashed her throat while Vaccaro held the victim down. Willie's death penalty was affirmed by this court on June 27, 1983. Joseph Vaccaro was sentenced to life imprisonment. State v. Vaccaro, 411 So.2d 415 (La.1982). Roy Clark, Jr. and Brent Mikell were sentenced to death on January 1, 1975 for a murder committed during an armed robbery. This court affirmed the convictions but vacated the death sentence as, at the time of their conviction, the death penalty was illegal. State v. Clark, 340 So.2d 208 (La.1976), cert. denied 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782. Clark and Mikell were subsequently resentenced to life imprisonment.
In this case, the victim was brutally murdered during the robbery of his home. Death was not immediate. He was struck *562 in the head twice with a heavy glass object causing severe cuts. He was then savagely stabbed twice with a butcher knife, the first ripping into his lower abdomen and the second into his chest where the weapon was left imbedded six to eight inches. An examination of the photographs shows blood splattered about the room and onto furniture, evidencing the violence of the attack. Finally, the victim was shot in the head with a small caliber handgun.
After considering the sentence review memorandums submitted by the state and the defendant, the crime, and the defendant involved, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases in the Twenty-Second Judicial District.
For these reasons, the sentence should be affirmed.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
AFFIRMED.
DENNIS, J., concurs and assigns reasons.
NOTES
[*] Bailes, J., sitting for Justice Marcus.
[1] While the court reporter spelled the victim's name Radosti, an examination of the indictment and other documents shows the spelling to be Radoste.
[2] Defendant vigorously objected to the publishing of these photographs to the jury and requested a mistrial based upon his perception of the jury's reaction to the photographs. The trial court denied the motion, stating:

Well, I obviously wasn't as observant as you attorneys were. I didn't see anyone crying or gagging. But as I indicated earlier, I've seen many, many photos which were much more or more worse than those, that I didn't see anything inflammatory. I see absolutely nothing inflammatory. I deny the motion for mistrial. (Tr., Vol. III, p. 617).
[3] La.C.Cr.P. art. 798 provides in pertinent part:

It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
* * * * * *
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; ...
[4] La.C.Cr.P. art. 766 states:

The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.
[5] See: Tr., Vol. II, p. 424, lines 16-23; p. 425, lines 21-25; p. 426, lines 19-21.
[6] The two indices of exhibits reveal that there was very little marked for identification that was not offered into evidence. (Tr. Vol. II, pp. 411, 412; Vol. III, p. 667).
[7] BY THE COURT: I'm going to deny that motion. There's a practical matter of handling this evidence. When the jury comes back in, make your offer. That which is admissible will be left. That which is not will be removed from the courtroom. (Tr., Vol. III, p. 678, 679).
[8] The only other objection by defendant to not receiving test results found in the record is with reference to a latent print sent to the Louisiana State Police Crime Lab in Baton Rouge for analysis. With respect to this print, the record clearly shows that the state allowed defense counsel to view the report. (Tr., Vol. III, pp. 700, 701).
[9] BY THE COURT: Ladies and Gentlemen, the bailiff has presented me with a note from you, which I will read into the record. It says, "According to the law, does life mean until natural death, or does it mean a predetermined number of years?" According to Louisiana law, the only factors that you can take into consideration in making a determination as to the sentence to be imposed in this case are the statutory aggravating circumstances and the mitigating circumstances that are involved in this case and nothing else. It is based strictly on those factors that you make your recommendation.

I would again indicate to you that your recommendation must be unanimous, if you can either recommend unanimously the death penalty or life imprisonment. In the event you cannot unanimously agree to recommend the imposition of the death penalty or the imposition of life imprisonment without benefit of probation, parole, or suspension of sentence, then you should let me know and the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence.
Mr. Sheriff, you may retire the jury. (Tr., Vol. IV, pp. 943, 944).