**STATE of Louisiana, Appellee**

v.

**Demetric Lawaderick WHITLOCK, Appellant**

**No. 50,757-KA**

Court of Appeal of Louisiana, Second Circuit.

Judgment rendered September 28, 2016.

---

LOUIS G. SCOTT, Counsel for Appellant

JERRY L. JONES, District Attorney, GEARY S. AYCOCK, Assistant District Attorney, Counsel for Appellee

Before BROWN, MOORE, and LOLLEY, JJ.

BROWN, CHIEF JUDGE.

Defendant, Demetric Lawaderick Whitlock, was charged by grand jury indictment with two counts of second degree murder and was convicted by a jury of two counts of the responsive verdict of manslaughter in violation of La. R.S. 14:31. Defendant was adjudicated a fourth-felony offender and sentenced to two consecutive life sentences. Defendant has appealed. The primary issue on appeal concerns the disqualification of Louis Scott, defendant's retained attorney, based on a conflict of interest. For the following reasons, defendant's convictions and sentences are affirmed.

### Facts

On June 8, 2012, Dexter Burkhalter and Russell Atkins were discovered lying in a pool of blood on the floor of Atkins' residence in Monroe, Louisiana. Both victims had been fatally stabbed and then shot in the head post-mortem. Cocaine and pills were found on the floor of the home, and bloody shoe prints were tracked from the home's interior onto the porch. The following day, the victims' cell phones, a .22 caliber handgun, two knives and a pair of Nike tennis shoes were located about two miles from Atkins' residence. There was dried blood on all of the items.

Officers had information that Alton ("Little Randy") Dickson was a known narcotics dealer, and Atkins was Dickson's supplier. The state also had cellphone records showing that Dickson's girlfriend/common-law wife, Kewanna ("Kiki") Dickson, was the next to last person Atkins talked to the morning of the murders and was alleged to be romantically involved with him. A search warrant obtained for Dickson's residence was executed on June 9, 2012. Drugs and guns were found. Dickson and Kiki, who were questioned about the murders, voluntarily provided DNA samples, and officers obtained two pairs of tennis shoes from Dickson. Dickson was charged with drug and gun offenses, and Kiki was released.

Louis Scott, a contract attorney with the IDB, was appointed to represent Dickson on June 15, 2012. Attorney Scott met with Dickson and handled a bail hearing for him on August 13, 2012. Scott also obtained discovery from the state in Dickson's case on October 26, 2012, which included the entire narcotics division's case file on Dickson.

Continued investigation of the murders, specifically DNA evidence, cell phone records, and the shoe prints found at the murder scene, led authorities to suspect Rico Collins and Demetric Whitlock. On October 17, 2012, Collins and defendant were arrested for the murders of Burkhalter and Atkins. Collins gave two statements to the investigators wherein he admitted to going to Atkins' residence with defendant, purportedly to fill out an application for oil field work. Collins advised the officers that Whitlock killed both Burkhalter and Atkins. Collins admitted that he helped defendant move the bodies.

The record reveals that the motive for the murders centered around drugs and money. Collins and Whitlock were indicted by a grand jury on two counts of second degree murder on October 25, 2012.

Attorney Louis Scott was retained by Whitlock in November 2012.[1] Scott filed a motion for bond reduction on defendant's behalf on November 15, 2012, and conducted the bond reduction hearing for defendant on [3]December 13, 2012. At this hearing, Attorney Scott questioned detectives about Little Randy Dickson's possible involvement in the murders of Burkhalter and Atkins. In January 2013, Attorney Scott was provided discovery in defendant's case, including investigation reports that showed Dickson as a possible suspect and the DNA analysis of Dickson and Kiki.

On February 26, 2013, Attorney Scott filed a motion to withdraw in the Dickson case. The matter went before Judge Alvin Sharp on April 24, 2013.[2] The transcript of the hearing on the motion is extremely brief and indicates that Attorney Scott, in a bench conference, expressed to Judge Sharp that he had been retained to represent another defendant in a murder case in which Dickson had been a suspect. Judge Sharp summarily granted the motion to withdraw based on the conflict as represented by Attorney Scott. The state asserts, and the record confirms, that neither the district attorney nor the trial judge in the Whitlock case was made aware of the conflict brought to the attention of Judge Sharp by Attorney Scott in the Dickson

matter. Furthermore, the motion filed by Attorney Scott in the Dickson matter failed to identify Whitlock or the docket number of the Whitlock case; instead, the motion simply alleged that Attorney Scott had been retained in another matter in which both Dickson and the new client were suspects.

Over the next five months, Attorney Scott represented defendant and formed his defense strategy based on the theory that another person,[4]specifically Dickson, was the actual murderer. Trial was set for October 21, 2013. Attorney Scott had subpoenaed Scotty Sadler, the narcotics agent in the Dickson case, to testify at defendant's trial.

On October 17, 2013, the state filed a "Motion in Limine and To Insure Conflict Free Counsel for the Defendant," and the motion was heard that date. The state sought the disqualification of Attorney Scott, arguing that defendant was entitled to conflict-free counsel, and Dickson was entitled to the confidentiality of his communications with his attorney. At the hearing, the district attorney outlined the following ties between the Dickson and Whitlock cases:

- Similar drugs and packaging of drugs was found in Atkins' house and at the raid on Dickson's house, which was the day after the murders.

- Dickson's "wife" Kiki was involved with Atkins.

- Dickson told Attorney Scott that the police were asking for Dickson's ten-

---

1. Initially, Attorney Bryan Racer with the IDB was appointed to represent Whitlock. Less than a month after his indictment, Whitlock retained Attorney Scott. We note, however, that there was no written motion to substitute/enroll as counsel ever filed by Scott, nor does the record reflect that an oral motion was made.

2. According to the state, neither the DA in defendant's case, nor the DA in Dickson's case knew of, or was ever apprised of, Attorney Scott's representation of both Dickson and defendant. The motion filed by Attorney Scott in the Dickson case and the transcript of the ruling of Judge Sharp were, *inter alia*, supplemented in this appellate record on motion of the state. The transcript confirms that the DA had no prior knowledge of the motion.

nis shoes, Attorney Scott knew that Dickson had been a suspect, and that DNA evidence had been collected from Dickson and Kiki.

- Kiki was allegedly the second to last person to talk to Atkins prior to his murder.

Initially, the argument at the hearing centered on whether Attorney Scott planned to call Dickson to testify. Scott denied his intention to call Dickson as a witness. However, the district attorney advised the court that he might have to call Dickson to testify if Attorney Scott presented testimony that Dickson was the murderer. In any event, the DA pointed out that there was a strong likelihood that Attorney Scott would be put in the position of questioning or cross-examining Dickson, which is an actual conflict. Attorney Scott conceded that if he still represented both men, he would have a conflict, but he argued that his former representation of Dickson would not limit his representation of defendant. He also advised the court that he had intended to disclose the possible conflict to the court as early as June 2013, but he just did not do so. The district attorney strenuously argued that Attorney Scott represented both men until April 2013, knew of the conflict and withdrew from the Dickson case and never advised the court of the conflict. It was the state who, upon learning of the conflict the week before trial was set to begin, filed the motion and brought the issue before the court. The trial judge granted the motion and disqualified Attorney Scott, explaining:

> The filing that you [Attorney Scott] made in the [Dickson] case where you wanted to have another judge determine whether or not there was a conflict gives this court great pause especially at this hour because we're on the cusp of trial. Jury selection is to begin Monday and [Whitlock is] on trial for two counts of

murder, and you have two clients that you have questioned and one you're representing and one that you are not—no longer representing and this is problematic if not insurmountable. I don't know how we get around this. I don't.

. . .

It just looks like if you've interviewed someone for an hour and a half and you believe you have a conflict and then you maintain [representation] on their case for several months and then you do bond reductions while you still have both of them going on and you mention one client as a potential suspect and whether or not they have [girl]friends or weapons or whatnot. It would seem like you would at some point, have information from one being used to defend the other or vice versa and it's problematic.

. . .

Alton Dickson. Is intertwined throughout this case. The court is just finding out about this today, motions being filed this date, court does find that it would put potentially, in a double homicide, Mr. Scott in a position where he would have to cross-examine his former client, his former client being a potential suspect in this homicide, the state having to exclude every reasonable hypothesis of innocence, the former client's girlfriend being the second to last person to allegedly speak to the deceased, Russell Atkins, and the other information leads this court to believe that a conflict of interest does in fact exist and may materialize causing this matter to be retried. It's a significant—very, very significant case. May be the most significant case the court has on its docket at this point and do find that the removal of Mr. Scott from a potential conflict of interest point of view, and to prevent such during these proceedings is necessary and I'll remove him at this point.

Following the ruling, the trial judge asked defendant if he desired appointed counsel. Out of concern that Whitlock's defense not be hindered in any way, the court appointed an attorney to represent defendant and stayed the case. Defendant waived a pending motion for speedy trial. Attorney Scott advised the court that defendant desired to waive the conflict, and Whitlock also attempted to verbally waive the conflict in open court in order to keep Attorney Scott as his counsel. The court's reasons and ruling did not address the attempted waiver of conflict by defendant.

Defendant subsequently retained Attorney Charles Kincade. On July 7, 2014, Attorney Kincade filed a motion to quash the indictment or alternatively to require the state to produce alleged *Brady* evidence in the form of an additional statement allegedly made by Rico Collins. Attorney Kincade contended that the state had failed to produce the additional inconsistent statement made by Collins that indicated that he was more involved in the murders than he admitted in his previous statements. The motion was denied.

Defendant was found guilty of two counts of manslaughter. Dickson was not called to testify. Attorney Scott was allowed to re-enroll as appellate counsel for Whitlock, and the instant appeal was filed.

## Discussion

*Disqualification of Attorney Scott/Required Waiver of Motion for Speedy Trial*

Defendant argues that the trial court erred in removing Attorney Scott as counsel when no conflict existed. Defendant notes that the potential conflict was purely speculative since Dickson was not called to testify. Defendant also urges that the trial court should not have removed Attorney Scott over defendant's express waiver of the conflict. Defendant further asserts that the district attorney does not have the power to urge a conflict on the part of the defense attorney—such a right exists in favor of the defendant, not the state. Finally, defendant claims that he was required to waive his motion for speedy trial or proceed without counsel, which violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

The Sixth Amendment to the United States Constitution guarantees that "[in] all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. Const. amend. VI; *State v. Cisco*, 01–2732 (La. 12/3/03), 861 So.2d 118, *cert. denied*, 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004); *State v. Tensley*, 41,726 (La. App. 2 Cir. 4/4/07), 955 So.2d 227, *writ denied*, 07–1185 (La. 12/7/07), 969 So.2d 629. To be more than just a hollow right, the law requires that assistance of counsel be effective. As a general rule, therefore, Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant he is representing. *Id.* The right to counsel secured under the Sixth Amendment includes the right to conflict-free representation. *Id.*; *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

The issue of the right to conflict-free representation under *Holloway* can arise from counsel's joint representation of co-defendants at trial or out of an attorney's representation of both a defendant and a witness. *United States v. Morando*, 628 F.2d 535 (9th Cir.1980); *State v. Kirkpatrick*, 443 So. 2d 546 (La. 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); *State v. Franklin*, 400 So.2d 616 (La.1981); *State v. Tensley*, *supra*. The right to counsel's undivided loyalty is a critical component of the right to assistance of counsel; when an attorney is

burdened by a conflict of interest, he deprives the client of his Sixth Amendment right as surely as if he failed to appear at trial. *Bonin v. California*, 494 U.S. 1039, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990). Thus, when an issue of conflict of interest arises, the court must ensure that the conflict is either eliminated or waived. *State v. Tensley, supra, citing United States v. Santos*, No. 04–60024–02, 2006 WL 2524160 (W.D. La. Aug. 29, 2006).

■ Disqualification of counsel in cases in which an attorney is potentially or actually in a position to use privileged information obtained during prior representation of a client is rooted in notions of fundamental fairness; allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an "unfair advantage." *United States v. Ostrer*, 597 F.2d 337 (2d Cir.1979); *United States v. Escobar–Orejuela*, 910 F.Supp. 92 (E.D.N.Y.1995); *State v. Tensley, supra*. It is well-settled that a fair trial in a fair tribunal is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). The question of disqualification of counsel therefore implicates not only Sixth Amendment rights of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interest in ensuring a just verdict and a fair trial. *United States v. Locascio*, 6 F.3d 924 (2d Cir.1993), *cert. denied*, 511 U.S. 1070, 114 S. Ct. 1646, 128 L.Ed. 2d 365 (1994); *United States v. Escobar–Orejuela, supra; State v. Tensley, supra*.

Rule 1.7 of the Louisiana Rules of Professional Conduct provides:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

■ The Louisiana Supreme Court has consistently held that a defense attorney required to cross-examine a current or former client on behalf of a current defendant suffers from an actual conflict. *State v. Cisco, supra*; *State v. Carmouche*, 508 So.2d 792 (La. 1987); *State v. Franklin, supra*. If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client. *State v. Kahey*, 436 So.2d 475 (La. 1983); *Zuck v. Alabama*, 588 F.2d 436 (5th Cir. 1979), *cert. denied*, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).

■ If an actual conflict exists, it need not be shown that the divided loyalties actually prejudiced the defendant in the conduct of his trial. *Zuck v. Alabama, supra*. In *State v. Cisco, supra*, an actual conflict was determined to exist, and the court found that the trial court was sufficiently alerted to the attorney's conflict of interest prior to trial. In a pre-trial context, regardless of how the conflict of interest issue arises, the trial court has two options to avoid a conflict of interest: appoint separate counsel or take adequate steps to ascertain whether the risk of a conflict is too remote to warrant separate counsel. *State v. Tart*, 93–0772 (La. 2/9/96),

672 So.2d 116, *cert. denied*, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). If an actual conflict exists and is recognized prior to trial, a defendant may be allowed to waive his right to counsel unburdened by a conflict of interest. Before a defendant can knowingly and intelligently execute a valid waiver of conflicted counsel, he must be told: (1) that a conflict of interest exists; (2) the consequences to his defense from continuing with conflict-laden counsel; and (3) that he has a right to obtain other counsel. *State v. Cisco, supra; State v. Sartain*, 98–0378 (La.App. 4th Cir. 12/01/99), 746 So.2d 837, *writ denied*, 00–0341 (La. 09/15/00), 769 So.2d 4.

Although a criminal defendant has the right to retained counsel of his choice, that right is not unfettered. *United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006); *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). A district court may disqualify a criminal defendant's counsel of choice in spite of the defendant's express waiver of any conflict of interest. *Id.*; *United States v. Urutyan*, 564 F.3d 679 (4th Cir.2009). A district court must be allowed substantial latitude in refusing defendants' waivers of their Sixth Amendment right to conflict-free representation, not only where an actual conflict may be demonstrated before trial but also where there is a potential for conflict which may develop into an actual conflict as the trial progresses. *Wheat, supra*. The district court must recognize a presumption in favor of the defendant's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but also by a showing of a serious potential for conflict. *Id.*; *United States v. Basham*, 561 F.3d 302 (4th Cir.2009), *cert. denied*, 560 U.S. 938, 130 S.Ct. 3353, 176 L.Ed.2d 1245 (2010).

In the instant case, the trial court did not commit error in removing Attorney Scott from Whitlock's representation or in ordering his removal over defendant's attempted waiver of conflict. Attorney Scott perceived the conflict early on and withdrew surreptitiously from his representation of Alton "Little Randy" Dickson, after becoming privy to discovery in the Dickson matter and having been retained by defendant. Attorney Scott admitted that his strategy was to show that another individual, specifically Dickson, was the murderer of the victims in this case. While Attorney Scott maintained that he did not plan to call Dickson to testify at trial, implementation of his admitted strategy could have forced the state to call Dickson and put Attorney Scott in the position of cross-examining a former client. Attorney Scott had confidential information from his representation of Dickson that he was going to utilize in his defense of Whitlock. At the time that the trial court was required to analyze the conflict, one week before defendant's trial was scheduled to begin, the potential conflict issues presented by Attorney Scott's representation of both Dickson and defendant were more than apparent. The fact that the DA did not call Dickson to testify at trial does not cure the myriad of very serious potential conflict issues that could have erupted during defendant's trial. For these reasons, the trial court did not abuse its discretion when it refused to honor Whitlock's attempted waiver of the conflict.

A prosecutor, whose role is sometimes described as "quasi-judicial," must seek to ensure the fairness and reliability of both the criminal justice process and the outcomes of that process. Bruce A. Green, *Her Brother's Keeper: The Prosecutor's Responsibility When Defense Counsel Has a Potential Conflict of Interest*, 16 Am. J. Crim. L. 323, 335-38 (1989). This includes a duty to disclose potential conflicts of inter-

est to the trial judge. *Wheat, supra.* In the instant case, as an officer of the court and a representative of the State of Louisiana, the district attorney had not only the authority but a duty to challenge defendant's representation by Attorney Scott.

Finally, defendant's argument that he was forced to waive his motion for speedy trial or proceed without counsel is without merit. Defendant's waiver of the motion for speedy trial was done voluntarily and Whitlock suffered no prejudice.

## Denial of Motion to Quash or Require Disclosure of Brady Material

The alleged *Brady* material at issue is a third "statement" made by Rico Collins that defendant claims was not produced by the state. In this alleged "statement," there are inconsistencies that defendant urges would have shown that Collins was more involved in the murders than he admitted in previous statements and, thus, it would have been exculpatory to defendant. In each of the first two statements made to police, Collins admitted to increased involvement in the murders, but consistently stated that defendant stabbed and shot both victims. According to defense counsel, in the most recent undisclosed conversation that was had by the prosecutor and/or investigator with Collins, he stated that he stabbed one of the victims, which was more than he admitted to in his previous statements.

The state notes that the first statement made by Collins on October 17, 2012, is one statement in two segments separated by a lunch break–not two separate statements. The second statement made by Collins was on October 18, 2012. Both statements were produced to defendant during discovery. Collins then made a plea deal with the state. Defense counsel was given notice of the date of Collins's guilty plea hearing. However, defendant's attorney neither attended this hearing nor requested a transcript which would have set forth the factual basis for his plea.[3] Collins then agreed to testify against defendant. The only other communication the district attorney had with Collins was a meeting for trial preparation on October 16, 2013; Collins's attorney and an investigator were also present. The state argues that it is not required to provide defendant with a transcript or recording of its witness's trial preparation unless its witness (Collins) was to testify inconsistently with what he related to the district attorney during trial preparation. The state does not dispute that Collins admitted during trial preparation to stabbing one of the victims, but it maintains that Collins changed nothing regarding the actions he claimed were taken by defendant. The state submits that Collins's "story" *about defendant's involvement* has been "out there" since 2012 and has not changed.

There was a lengthy and heated argument on whether the perceived inconsistency in discussions with Collins during trial preparation constituted *Brady* material. The court allowed defense counsel to question the investigator who was present at the trial preparation to find out exactly what Collins had related. Trial commenced the following day. Defense counsel complained that he garnered no new information from his discussion with the investigator and maintained that there had been a *Brady* violation. The court disagreed and noted that all prior recorded statements of Collins had been produced during discovery and that discussions with witnesses for trial preparation were not generally recorded. In any event, the court held that the substance of the conversation with Collins during trial preparation was now disclosed and defense counsel had

---

**3.** The transcript of the plea has been supplemented into the record.

spoken with the district attorney, Collins's attorney, and the investigator who was present during Collins's trial preparation session.

■■■■■ The purpose of pretrial discovery procedures is to eliminate unwarranted prejudice to a defendant that could arise from surprise testimony. *State v. Mitchell*, 412 So.2d 1042 (La. 1982); *State v. Tate*, 38,576 (La.App. 2 Cir. 8/18/04), 880 So.2d 255, *writ denied*, 04–2554 (La. 1/14/05), 889 So.2d 268. Discovery procedures enable a defendant to properly assess the strength of the state's case against him in order to prepare his defense. *State v. Roy*, 496 So.2d 583 (La.App. 1st Cir.1986), *writ denied*, 501 So.2d 228 (La. 1987). If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such a prejudice may constitute reversible error. *State v. Ray*, 423 So.2d 1116 (La. 1982).

■■■■ Under the United States Supreme Court decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the state, upon request, must produce evidence that is favorable to the accused where it is material to guilt or punishment. This rule has been expanded to include evidence that impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Where a specific request is made for such information and the subject matter of such a request is material, or if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the information to the trial judge for an in camera inspection. *Id.*; *See U.S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *State v. Cobb*, 419 So.2d 1237 (La. 1982).

■■■ The test for determining materiality was firmly established *in U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and was applied by the Louisiana Supreme Court in *State v. Rosiere*, 488 So.2d 965 (La. 1986). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *U.S. v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *State v. Rosiere*, 488 So.2d at 970–71.

■■■ The statement made by Collins during trial preparation was that he stabbed one of the victims yet he maintained that Whitlock stabbed both of the victims and shot them both in the head. This statement implicates Collins but does not in any way change his previous statements regarding defendant's involvement and is not an inconsistency constituting *Brady* material that would be exculpatory to defendant. The trial judge painstakingly listened to argument from both attorneys and went to great lengths fashioning a remedy that would eliminate any perceived prejudice or surprise to the defense. By the time the trial began, Attorney Kincade had all prior recorded statements (which had been produced early on during discovery), a copy of the factual basis for Collins's guilty plea, and had engaged in discussions with Collins's attorney, the district attorney and the investigator present at the trial preparation session with Collins. The defense was armed with every possible piece of evidence and statement of Collins with which to impeach him at trial. Finally, this further admission of involvement by Collins fails to meet the materiality test of *Bag-*

*ley, supra.* Had Collins's further admission of participation been disclosed earlier to the defense there was no reasonable probability that such would have affected the outcome of the trial or undermine confidence in that outcome. In fact, the state was only aware of this admission by Collins the week before trial. This assignment is without merit.

## Conclusion

For the reasons set forth above, we affirm the convictions and sentences of defendant, Demetric Lawaderick Whitlock.