938 So.2d 1153 (2006)
STATE of Louisiana, Appellee
v.
Robert HARTLEY, Appellant.
No. 41,178-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2006.
Louisiana Appellate Project, by Carey J. Ellis, III, Louis G. Scott, for Appellant.
*1154 Jerry L. Jones, District Attorney, Charles L. Brumfield, Edward D. Young, Assistant District Attorneys, for Appellee.
Before STEWART, CARAWAY and PEATROSS, JJ.
STEWART, J.
The defendant, Robert Hartley, was convicted as charged of the second degree murder of his infant daughter. He was sentenced to a mandatory term of life imprisonment without benefits. Arguing insufficiency of the evidence, the defendant now appeals. We find no merit to the defendant's assignment of error, thus we affirm his conviction and sentence.

FACTS and PROCEDURAL HISTORY
The defendant and his girlfriend, Dewanna Jones, were living together at the time of the crime in a trailer home in Bastrop, Louisiana, with their twin infant daughters, who were born December 9, 2002. The defendant's mother, Stacy Caldwell, and her husband lived a few hundred yards away.
Sometime between 12:30 and 1:00 p.m. on February 26, 2003, Dewanna walked to Stacy's house to ask her about a ride to a medical appointment, leaving the defendant alone with their two infant girls. Dewanna made a phone call from Stacy's house to reschedule the appointment. After staying at Stacy's about 30 minutes, Dewanna rode with Stacy to Dewanna's and the defendant's trailer. When they arrived, the defendant opened the door. He was holding one of the twins, Skyler[1], and said he was glad they were there because he could not get her to stop crying. Stacy, a licensed practical nurse, reached for Skyler, heard her gasp, and realized that she was not breathing. Skyler's arms were limp. Stacy immediately asked the defendant if he had shaken the infant, and he answered, "No, Ma'am." Stacy yelled for Dewanna to call 911 and she began to perform CPR on the infant.
Dewanna went to a nearby neighbor's house to call 911. At 1:15 p.m., the 911 dispatcher for the Morehouse Parish Sheriff's Department received the emergency call from Dewanna, who reported that her infant had stopped breathing. Skyler was taken to the local hospital, and then to the pediatric ICU at St. Francis Medical Center in Monroe. Dr. Aristoteles Pena-Miches, a pediatric neurologist, examined Skyler, performed various tests and conclusively opined that Skyler had suffered "shaken baby syndrome" from a "very forceful activity" that occurred the same day she was admitted into the hospital. Dr. Pena-Miches stated that trauma of this magnitude can only be produced by either a hit by an eighteen wheeler or shaking. Dr. Pena-Miches further stated that the lack of external signs of trauma does not exclude shaken baby syndrome.
When Dewanna first discussed Skyler's condition with the doctor, she was told that there was some swelling and bleeding. Dewanna asked what caused it, and the doctor said "[Y]ou know." Dewanna protested twice that she did not know, after which she became very distraught and cried that she was going to kill the defendant. Approximately two days later, tests confirmed that Skyler was brain dead. She was taken off life support and died in Dewanna's arms minutes later. The subsequent autopsy conducted by the forensic pathologist confirmed that Skyler's death was caused by shaken baby syndrome.
*1155 In the early morning hours of February 27, 2003, Deputy Cassandra Tubbs, a juvenile investigator, conducted an investigation and took statements. The defendant gave a recorded statement. He admitted that he was alone with the twins when Skyler started crying. He picked Skyler up out of her swing, bumping her head on the swing in the process, and she began to cry louder. The defendant then admitted rocking, bouncing, and shaking Skyler as he cradled her in his arms to get her to quit crying. He indicated that he changed her diaper, after which she "started crying again real loud." He admitted that the loud crying "got irritating to [him]" and that he was "getting a little angry." He also described himself as "a little upset" and "fairly agitated." He stated that he took deep breaths to try to calm himself down. He admitted that he did not realize that he was shaking Skyler "too hard" and "harder than what I thought" until he noticed her head "coming up off" his arms. He further admitted that he quit shaking Skyler when he realized that her head was bouncing up and down off of his arm a couple of times, which was about the same time that his mother arrived at the trailer.
The defendant was charged by bill of indictment with second degree murder. He entered a plea of not guilty at arraignment. After a hearing on the defendant's motion to suppress his statements, the defendant changed his plea to not guilty and not guilty by reason of insanity. A motion for appointment of a sanity commission was granted, and the defendant was later found to be competent to proceed.
During the trial, the state presented witnesses and evidence supporting the facts and circumstances of the crime and investigation described hereinabove. According to Stacy, the defendant's mother, the defendant completed the second grade in regular school and was educated through special education thereafter. Evidence was subsequently presented through another witness that the defendant's grade equivalency test score was an average of third grade, second month. After the second grade, the defendant was institutionalized for mental disorders, and was in and out of mental institutions for much of his life. Stacy related that the defendant had been receiving outpatient treatment for his mental disorders, and had been taking his medications except for the time when his Social Security benefits were briefly discontinued in 2002. She said the defendant was ecstatic to be a father, and she had coached him on how to properly hold his infant girls.
The state and defense also presented various witnesses, including expert witnesses, regarding the defendant's mental diagnoses, sanity, and educational level. Dr. Richard Warren Williams, a psychiatrist who evaluated the defendant one time in July 2004, testified for the state that the defendant, in his opinion, was competent to stand trial and that he knew right from wrong at the time of the offense. Dr. Williams found the defendant to be in the range between low average and borderline intelligence, but certainly not even moderately mentally retarded. His diagnosis of the defendant included intermittent explosive disorder, which he described as an impulse control disorder. Dr. Williams further found the defendant to have both anti-social and borderline type traits. Dr. Williams classified the defendant as being "not even close" to needing hospitalization but also not functioning in the high sense that you might need to perform in many jobs. Dr. Williams found that the defendant "without question" had the ability to provide adequate care for an infant and was not psychotic.
*1156 The defense's witnesses included C.J. Beck, a clinical manager and family evaluator, who first met the defendant in 1997 in his capacity as counselor at the Methodist Children's Home. Beck's contact with the defendant ended in 1998, and began again later from about 2001 until January 2003 at River South Rehabilitation Center. Beck discussed the defendant's diagnosis of bipolar disorder and his counseling team's work in helping the defendant deal with mood changes, including anger and depression. He related that the defendant's attendance became sporadic and he became less compliant with services, including not taking his medication consistently. Beck testified that at a family counseling session, he advised Dewanna not to leave the children alone with the defendant, because he was not on his medication at the time, and he had a history of behavior digressions when he was not medicated. Beck also reinforced this with the defendant's mother.
When Dewanna testified for the state, she denied that anyone had ever cautioned her not to leave the defendant alone with the babies. She stated that the defendant had been attending therapy about once a week, but quit because of transportation issues. Dewanna further related that the defendant had not taken his medications from about October or November 2002 until the date of the crime.
The defense presented various witnesses who testified that Skyler initially had trouble feeding, and had a bruise on her head on January 13th. The defense also presented witnesses who stated that the defendant was a good father who helped to take care of the babies.
The defendant's treating psychiatrist, Dr. Aruna Gullapalli, explained that it was hard to pinpoint a specific diagnosis for the defendant. She described him as exhibiting a lot of impulsive behavior and mood swings. She stated that he knew right from wrong with regard to knowing not to kill or harm a person, but she did not believe that he knew right from wrong with regard to how to console a crying infant.
After the defendant's trial before a 12-person jury, he was found guilty as charged of second degree murder. The defendant subsequently filed a motion for post-verdict judgment of acquittal, which was denied by the trial court. The defendant was sentenced to the mandatory term of life imprisonment without benefits. This appeal followed.

DISCUSSION
The defendant's sole assignment of error relates to the sufficiency of the evidence. He argues that the circumstantial evidence offered by the state was insufficient to support the jury's verdict of second degree murder. He contends that, although he admitted shaking the infant, he did not admit shaking her violently enough for shaken baby syndrome to have occurred. He notes that there were no eyewitnesses to the events leading to the infant's death, and that the arrest and subsequent conviction were apparently based on the opinion of the doctors.
The state notes that the defendant admitted shaking the infant. It recounts the expert testimony given by the pediatric neurologist and forensic pathologist that this was a case of an infant that had been severely shaken to death. The state disagrees that the conviction is based solely on circumstantial evidence, noting that the defendant's statement is not circumstantial evidence. It concludes that the evidence presented, viewed in the light most favorable to the prosecution, supports the defendant's conviction of second degree murder.
*1157 Applicable Law
The defendant was convicted as charged of second degree murder. La. R.S. 14:30.1 A(2)(b) defines second degree murder as the killing of a human being when the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
Cruelty to juveniles, as it relates to this matter, is defined in La. R.S. 14:93 as:
(1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.
Criminal negligence is defined in La. R.S. 14:11 as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
The question of sufficiency of evidence is properly raised by a motion for post-verdict judgment of acquittal. State v. Howard, 31,807 (La.App. 2d Cir.8/18/99), 746 So.2d 49, writ denied, 1999-2960 (La.5/5/00), 760 So.2d 1190. La. C. Cr. P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.), writ denied, 604 So.2d 973 (La.1992).
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La. 10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. Rather, a reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
*1158 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App. 2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App. 2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
Application of the Law to the Facts
A review of the entire record reveals that the evidence, viewed in the light most favorable to the prosecution, including the facts established by the direct evidence and inferred from the circumstances established by that evidence, were sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime of second degree murder. See State v. Sutton, supra; State v. Owens, supra. Direct evidence in the case sub judice included the defendant's statement in which he admitted that the infant's crying upset him and he was "fairly agitated" and "getting a little angry." The defendant further admitted shaking, bouncing, and rocking the infant "hard," and "harder than I thought." He stated that her head was "coming up off" his arms. The defendant's admissions, coupled with the expert testimony that the infant's death resulted from recently inflicted shaken baby syndrome, was clearly sufficient to support the defendant's conviction as charged of second degree murder. This killing occurred when the defendant was engaged in the perpetration of cruelty to a juvenile, which does not require intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1 A(2)(b). Cruelty to juveniles is defined as the intentional or criminally negligent mistreatment or neglect whereby unjustifiable pain or suffering was caused to the infant. See La. R.S. 14:93. Such cruelty was clearly present here. The defendant shook his infant daughter in response to her crying and realized that he was shaking her too hard. It cannot be said that he did not know what he was doing was wrong.
Therefore, this assignment is without merit.

CONCLUSION
For the foregoing reasons, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] La. R.S. 46:1844 W(1)(a), regarding confidentiality of crime victims who are minors and victims of sex offenses, provides in part that the public disclosure of the name of the juvenile crime victim by any public official or officer or public agency is not prohibited when the crime resulted in the death of the victim. Such is the case here.