955 So.2d 227 (2007)
STATE of Louisiana, Plaintiff,
v.
Jessica M. TENSLEY and Kevin Falcon, Defendants.
No. 41,726-KA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2007.
Rehearing Denied May 3, 2007.
*231 Sherry Watters, Louisiana Appellate Project, for Defendant-Appellant, Jessica M. Tensley.
Laura M. Pavy, Louisiana Appellate Project, for Defendant-Appellant, Kevin Falcon.
Jerry L. Jones, District Attorney, Stephen T. Sylvester Assistant District Attorney, for Plaintiff-Appellant.
Before BROWN, CARAWAY and LOLLEY, JJ.
CARAWAY, J.
Kevin Falcon was convicted by a unanimous jury of second degree murder while engaged in cruelty to a juvenile and received the mandatory life sentence for the conviction. Jessica M. Tensley was also convicted by a 10-2 jury vote of second degree murder while engaged in cruelty to a juvenile. The trial judge granted Tensley's motion for post verdict judgment of acquittal and reduced her verdict to manslaughter. On the reduced charge, Tensley received a 35-year hard labor sentence. Both defendants appeal their convictions and sentences. The state appeals the granting of Tensley's post verdict judgment of acquittal. Finding an actual conflict of interest involving Falcon's trial counsel's prior representation of Tensley which was not remedied after pretrial proceedings, we reverse both parties' convictions and remand.

Facts
On April 18, 2003, Tensley resided in the Parkview Apartments in Monroe, Louisiana, with her boyfriend Falcon. Tensley called 911 after finding her five-month-old son unresponsive in his bed shortly before 7:00 a.m. Once paramedics arrived, the child was rushed to E.A. Conway Hospital and then transferred to the pediatric intensive *232 care unit at St. Francis Hospital. The child was in critical condition. X-rays and CAT scans revealed numerous injuries including fractures of the skull, ribs, wrists and femurs. Because of his condition and the type of injuries, the hospital contacted child protective services. Thereafter, the matter was referred to the Monroe Police Department. Although testing determined the child to be brain-dead, life support was kept in place to give the family, including the child's father living in Texas, a final opportunity to visit the child.
Police initially interviewed the treating physician, Dr. Aristoteles Pena-Miches, and were informed of the child's injuries. Tensley was also interviewed and reported she was unaware of how the child was injured so severely. At the conclusion of the initial interview, Tensley was arrested. On that day, Falcon was also interviewed and likewise denied any knowledge of how the child was injured.
Through further investigation, police learned that Tensley and Falcon shared the apartment and were the only ones who cared for the victim in the weeks prior to his death. Falcon gave a recorded statement and again denied harming the child. He again denied that Tensley was responsible for the child's injuries. Falcon was eventually arrested on April 21.
The defendants were tried together and found guilty of the child's second degree murder. Falcon was sentenced to the mandatory sentence of life imprisonment. Tensley's motion for post verdict judgment of acquittal was granted and the trial judge entered a conviction of manslaughter, sentencing Tensley to 35 years at hard labor. It is from these convictions and sentences that the defendants now appeal.

Discussion
I. Sufficiency of Evidence
On appeal, both defendants have raised issues with the sufficiency of the evidence to convict. Tensley argues that the state failed to prove beyond a reasonable doubt that she was the perpetrator of, or a principal to, second degree murder, or even manslaughter. She also contends that her criminal negligence was not proven and guilt by association does not suffice for conviction as a principal. Falcon argues that insufficient evidence supported his conviction for second degree murder because virtually no evidence showed that he ever harmed the child.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The question of sufficiency of the evidence is properly raised by a motion for post verdict judgment of acquittal. State v. Hartley, 41,178 (La.App.2d Cir.8/23/06), 938 So.2d 1153. A motion for post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. Id.
*233 The standard for testing the sufficiency of the evidence is applicable in cases involving both direct and circumstantial evidence. State v. Dooley, 38,763 (La. App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 04-2645 (La.2/18/05), 896 So.2d 30; State v. Scott, 31,617 (La.App.2d Cir.2/24/99), 730 So.2d 515.
An appellate court reviewing the sufficiency of evidence in cases involving both direct and circumstantial evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution, and when the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Pickard, 40,422 (La.App.2d Cir.12/14/05), 918 So.2d 485; State v. Douglas, 39,036 (La.App.2d Cir.10/29/04), 888 So.2d 982, writ denied, 04-3146 (La.4/1/05), 897 So.2d 601.
Further, when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. State v. Toups, 01-1875 (La.10/15/02), 833 So.2d 910; State v. Chism, 436 So.2d 464 (La. 1983).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir 5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.
In pertinent part, second degree murder is the killing of a human being when the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
Cruelty to a juvenile, as it relates to this matter, is defined as the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. La. R.S. 14:93. The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Porter, 99-1722 (La.App. 3d Cir.5/3/00), 761 So.2d 115. Mistreatment as used in this statute means "abuse." Id.
Criminal negligence is defined in La. R.S. 14:11 as follows: Criminal negligence exists when although neither specific nor general criminal intent is present, there is such a disregard of the interest of the others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. Unlike general or specific criminal intent, criminal negligence is essentially negative. Rather than requiring the accused intend some *234 consequence of his actions, criminal negligence is found from the accused's gross disregard for the consequences of his actions. State v. Martin, 539 So.2d 1235 (La.1989).
The state presented the testimony of two expert physicians in support of its case. Dr. Aristoteles Pena-Miches, qualified by the court as an expert in pediatric neurology, testified that he treated Tensley's five-month-old child at St. Francis Hospital on April 18, 2003. Dr. Frank Peretti, an expert in forensic pathology, testified that he performed the autopsy. In testimony, the doctors agreed that the child was beaten to death. The immediate cause of death was the skull fracture which caused retinal bleeding and bilateral retinal detachment.
Specifically, Dr. Peretti concluded the child was a victim of battered child syndrome because of numerous other apparent injuries. He testified that the brain injury was at least 72 hours old and was caused either by shaking or slamming the child against a wall or floor. Dr. Peretti testified that the injuries could not have been caused by a fall from a bed or chair due to the great force required to fracture the skull.
Dr. Pena-Miches further described the effect of the skull fracture which according to his testimony resulted from one abusive event. He stated that the injury would cause "stroke-like" damage and inflammation of the brain. The bones of the skull would eventually separate to alleviate cranial pressure caused by swelling. In this case, the child's fontanelle dilated as the brain pushed outward because of high pressure. This condition causes lethargy, vomiting, and possibly seizures. Dr. Pena-Miches testified the child had no chance of surviving with no treatment for 72 hours post injury.
Both physicians testified that the injuries included more than twelve rib fractures and a broken right hand, and that the rib fractures were in various stages of healing, meaning some were caused many weeks prior to the child's death. Likewise, the child's legs showed multiple fractures to both femurs and one area where the femur was "completely shattered in multiple pieces." Specifically, Dr. Pena-Miches noted that such fracture was caused by "a tremendous blow to the bone that made it explode." Dr. Peretti observed that some of the rib fractures were possibly 90 days old while other rib fractures were only days old.
Dr. Pena-Miches identified Tensley as the victim's mother, and Falcon as "the guy who was with her." He recalled that when he informed Tensley that the child's injuries were serious, Tensley said to Falcon, "I told you so. I told you so." Falcon then told Tensley to "shut up" and covered Tensley's mouth.
On cross-examination, Dr. Pena-Miches conceded that no physical bruises on the victim were observed by him during his examination even though a great amount of force was required to cause the injuries. Dr. Peretti testified that the child's head injuries were not visible, but they included a one and one-half inch fracture of the skull and at least five impact sites visible after the child's scalp was pulled back. The doctor testified it was not unusual for an injured child to have no apparent bruising or other outward signs of injury.
Detective Tracy Heath, the lead investigator, also testified for the state. She was on call on April 18, 2003, when she responded to St. Francis Medical Center. Detective Heath interviewed each defendant separately. After informing Tensley of the severity of the child's injuries, Tensley showed little emotion and only cried after she was arrested. She testified that *235 Tensley denied hurting the child or having any knowledge of who inflicted the injuries. When Detective Heath asked if Falcon hurt the child, Tensley replied she did not believe he would. Tensley also stated that she did not know if Falcon loved her child. Tensley initially stated she and the victim were alone in the apartment the night before the victim was rushed to the hospital. In a subsequent statement, Tensley acknowledged that Falcon was also at the apartment that night.
Detective Heath testified that Falcon provided a recorded statement at the police station and denied any knowledge of how the child was injured. Falcon's recorded statement in which he denied doing anything to the child was admitted into evidence. He adamantly insisted that Tensley would not hurt the child because she was not that type of person. Falcon moved into Tensley's apartment in January of 2003. He admitted that he and Tensley cared for the child but he also claimed that babysitters took care of him on occasion. Falcon reported that the babysitters complained that the child cried too much. He attributed the excess crying to his being spoiled by Tensley. Falcon recalled that in March or April of 2003, he and Tensley left town overnight and Sharon Williams babysat. Falcon said about two weeks before the incident, he and Tensley went fishing and left the baby with his cousin, Gloria Reed. In his statement, Falcon said he thought one of the babysitters hurt the child. After the fishing trip, he noticed a knot in the baby's leg which Tensely treated with warm water. Falcon remembered a scratch on the baby's chest but denied it was a cigarette burn. He admitted smoking a pack of cigarettes daily. Falcon maintained that Tensley did not smoke or drink. He also admitted pushing Tensley down a "bunch" of times.
The two ambulance attendants who responded to the 911 call testified that Tensley walked out of her apartment holding the victim, who was unresponsive and barely breathing. According to one of the attendants, Tensley handed her the child and turned to walk away. The other ambulance attendant persuaded Tensley to get in the ambulance and ride to the hospital. Both said Tensley showed little emotion during the ride but stated the child was alive about 5:00 a.m. when she fed him and gave him medicine. One of the driver's trauma reports noted no external trauma to the child.
Clareasa Butler testified she visited a friend living in the same apartment complex several times. Butler heard the victim crying or hollering but did not know what was wrong with the child. Once, when she encountered Tensley standing outside her apartment holding the crying child, Butler asked to hold him as she believed something was wrong. Tensley replied "no," asserting that the baby was her child and she alone would provide care. Early one morning at 3:00 a.m., Butler and her friends heard bumping and loud music playing in the other apartment. The police were called but they reported there was no disturbance in the apartment.
Lawanda Butler, sister of Clareasa Butler, testified that anytime she visited her friend, who lived next door to defendants, she also heard the baby crying. On one such visit, she heard a woman scolding a crying child next door. While she did not see the woman, she knew Tensley lived in the apartment. Butler only knew the defendants through seeing them around the complex and talking with Falcon. Falcon would ask the Butlers to take him riding around as he wanted to get out of the apartment because he was tired of "what she's doing to the baby." Falcon did not explain this statement to the Butlers.
*236 Sharon Williams also resided where defendants lived and testified that she babysat several times. Williams described a good child who cried a lot, and even hollered when he was moved or touched. Williams informed Tensley that something might be wrong because of the child's behavior. Tensley told Williams that she discovered what was wrong and she believed his legs were stiff, so she had soaked them in warm water.
Williams once observed a mark on the child's chest which she believed to be a burn mark. The scar on the child's chest, visible in an autopsy photograph, was identified by Williams as the site of the burn she saw. Several days prior to the victim's death, Williams went to the defendants' apartment to borrow milk, and at that time, she saw the victim lying on the couch propped on a pillow, not moving much. Two or three days later, the victim was in the same type of position. Williams stated after seeing the victim in this condition the second time a day or so later, she was very concerned and was going to renew her advice to Tensley to take the victim to the hospital the next morning. This thought occurred to Williams the night before the victim was in fact taken to the hospital.
Tensley's defense counsel presented the evidence of the victim's prior medical treatment and Tensley's own testimony. Dr. Kermit Walters, Jr., qualified by the court as an expert in pathology and family medicine, testified he treated the victim approximately five times, the last time three days before the victim died. Just prior to the child's death, Tensley brought him to Dr. Walters' clinic after he had been treated at E.A. Conway Hospital. Tensley did not believe the child was recovering from his illness so Dr. Walters examined him. Dr. Walters noticed no signs of abuse during the examination. Dr. Walters testified he manipulated the victim's head and did not notice any sign of a skull fracture as he believed the child would have been in a lot of pain. His medical record did not discuss a soft spot on the left side of the child's head which Tensley claimed in her testimony to have reported.
The doctor also examined the child's limbs and chest and opined that the child's injured ribs were not "fresh broken bones," because there was no pain response during the examination. The doctor offered the same opinion as to the leg injuries. According to the doctor, the child's legs were wrapped around his mother during the time of the exam, and it did not appear as if the victim's legs were broken. Thus, there was no outward manifestation of injury observable during that time. The child was prescribed medicine for cold and cough, ear infection and pain, sinusitis, and fever.
Dr. Walters testified he reviewed an x-ray report which indicated the victim had poor bone mineralization which made him more susceptible to fractures. The doctor opined it was possible but not probable the skull fracture was caused by the child falling out of bed onto a concrete tile floor. On cross-examination, the doctor reiterated he observed no injuries, and if he had, he would have reported his observations. The doctor also noted Tensley, whom he had treated for depression at one time, appeared to be a concerned and caring parent.
Tensley testified that her relationship with the victim's father ended several weeks after he was born in November 2002. Tensley met Falcon through his sister, also a neighbor in the same duplex apartment where she lived. At the time the pregnant Tensley met Falcon, she was living with a friend and caring for the friend's eight-month-old child. Tensley recalled *237 that Falcon assisted her with the friend's child and then her own. "I mean, he just basically pampered (me) and I liked it."
Tensley testified she moved to the Parkview Apartments in January 2003, because she was unemployed and the apartment was income-based. She confessed that Falcon, also unemployed, moved in the apartment with her at the same time.
Tensley was adamant in her testimony that she did not injure her child, and she also testified she did not believe Falcon had injured the child. She acknowledged that at least once, Falcon pushed her down onto a couch while she was holding the baby. Tensley could not explain the victim's numerous injuries. She testified that several babysitters in the apartment complex cared for the child in her absence. However, she also admitted that only she and Falcon took care of the victim during the last one and one-half to two weeks prior to his death.
Tensley testified she was home with the child when Falcon returned to the apartment the night before the victim's death. A friend of Falcon's helped him walk up the stairs to the apartment as Falcon staggered and appeared drunk. According to Tensley, as soon as Falcon entered the apartment, his behavior changed, and he appeared sober, explaining that he had feigned his drunken behavior to leave the place where he had been prior to arriving home. Tensley recalled that Falcon ate and bathed, and then they both played with the victim before Tensley went to bed sometime near 10:00 p.m. Tensley stated Falcon took the victim into the living room, where he watched television and then put the child to sleep.
According to Tensley, she awoke shortly before 7:00 a.m. and found the victim unresponsive and breathing laboriously. After putting a cold towel on the victim, in an attempt to gain a response, Tensley gave the child to Falcon and ran to the apartment complex office to call 911. Falcon then brought the child to her and she initially spoke with a fireman who responded to the scene before giving the child to the ambulance medic. Tensley denied walking away from the ambulance, but explained that she was attempting to get into the back compartment with the medic and the victim when she was told she could not ride there. Tensley then got into the front of the vehicle and they proceeded to the hospital.
While at the hospital, Tensley learned of the child's severe life-threatening injuries. She stated that she did not initially believe the child was going to die. At the hospital, Tensley learned from Falcon that he had gotten up sometime during the night and heard the victim. Falcon thought the victim was playing and went back to bed.
Kevin Falcon presented three witnesses in his defense, although he did not testify. Gloria Nelson, Falcon's mother, testified she knew Tensley as she had previously lived next door to her and because of her involvement with Falcon. Nelson stated she knew Falcon lived with Tensley but that he would also spend several nights of the week with Moline Long. Nelson would frequently see Falcon during the day when he was visiting Long or when he took the victim to the Urban Clinic near her home.
Janice Potts, Falcon's sister, testified she lived next door to Tensley prior to her involvement with Falcon. Potts indicated she only knew Tensley casually. Potts recalled that Falcon was living with both Tensley and Long as he would spend several nights of the week with Long and several nights at Potts' home before returning to Tensley's home.
Moline Long testified she was involved with Falcon from September 2002 until the *238 time of his arrest for the instant crime and knew of his involvement with Tensley. Long's sister lived in the Parkview Apartment Complex, and Long would visit there every weekend.
The obvious defense for each defendant which is central to both arguments on appeal is that neither defendant was shown by direct evidence to have inflicted the injuries to the child. Nevertheless, viewing the evidence in the light most favorable to the state, we find that the state's medical evidence and the evidence of the parties' custody of the child proved its case beyond a reasonable doubt against both defendants.
The medical evidence established that blunt force trauma was continually visited upon the child for a lengthy time period. This would be expected to cause the baby to exhibit pain, crying and sensitivity to movement, and indeed, the testimony of third parties revealed that condition of the child. The evidence revealed that witnesses had on more than one occasion instructed the defendants that something was wrong with the child. The victim's grave symptoms during the last 72 hours before his death would also be readily observable. Yet, Tensley testified that the child was laughing and playing nine hours before the emergency room call. Regardless of the question of which defendant may have been the sole perpetrator administering the beatings to the child, if indeed only one of the parties was the abuser, the medical evidence of the painful traumatic events experienced by the child over his short lifetime sufficiently establishes the neglect and mistreatment element of the crime of cruelty to a juvenile which may support the conviction of second degree murder. Any custodial party regularly present with the child throughout his life of constant serious injuries who did not act in aid of the child to alleviate his pain and determine the cause of his discomfort would exhibit such a disregard for the interest of the child to amount to gross criminal negligence.
Through Tensley's and Falcon's admissions, the state established that both were the primary caregivers of the child. Only one witness testified that she babysat the child in the month before his death. She denied harming the infant. Other than general allegations, neither Tensley nor Falcon presented credible evidence showing that this individual or anyone else could or did harm the child. Despite Falcon's involvement with another woman, the evidence clearly establishes that he was unemployed, resided in the house with Tensley and independently maintained routine custody of the child.
Most disturbing, however, were the facts immediately surrounding the death of the child. The evidence showed that Williams was the only individual other than the defendants who saw the baby in the two days prior to his death. She recognized that something was wrong with the child who was lying on a couch propped up by a pillow, substantially motionless. This indicated that the baby was at that time suffering from head trauma. Although she said nothing to the couple then, these facts after her second observation so disturbed Williams that she intended to go back to the apartment and tell Tensley to take the baby to the hospital. Obviously, neither Tensley nor Falcon sought medical treatment for the infant. Yet, the expert testimony established that this type of skull fracture could only be caused by blunt force trauma which would cause lethargy, vomiting and possibly seizures. That testimony also established that the failure to seek immediate medical treatment gave the child no chance of survival. The most incriminating evidence, however, came after the child was taken to the hospital in a *239 comatose state. It was then that Tensley was twice heard telling Falcon, "I told you so," and Falcon was observed putting his hand over her mouth and telling her to shut up.
Finally, contrary to the defense argument that neither defendant was shown by direct evidence to have inflicted the beatings, each defendant's statement that the other defendant gave proper care to the child and that the child exhibited no alarming symptoms of injury until the morning of his death raises the inference that both were directly and intentionally involved in abusing the child. Such statements can be understood as circumstantial evidence of their joint intentional abuse and the cover-up of their actions in the face of the overwhelming medical evidence of extended periods of trauma and pain endured by the child.
Accordingly, we find the evidence of the guilt of both defendants sufficient beyond a reasonable doubt.
II. Post Verdict Judgment of Acquittal
Because the evidence before us is sufficient to support the second degree murder conviction as to Tensley, we find the state's contentions on appeal regarding the trial court's granting of Tensley's post verdict judgment of acquittal to have merit.
A motion for post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty; this is a question of legal sufficiency. State v. Mitchell, 39,305 (La.App.2d Cir.2/17/05), 894 So.2d 1240, writ denied, 05-0741 (La.6/3/05), 903 So.2d 457.
After extensive arguments by both defense counsel and the state, the trial court granted Tensley's motion for post verdict judgment of acquittal. After briefly discussing Tensley's poor judgment choices, the trial court stated the following:
It doesn't make any sense to me at all. But I'm going to count that as another exercise of poor judgment on your part. Now, the Court has pondered heavily what to do on these motions that have been filed on your behalf. I've denied the motion for new trial. I think the trial was fairly conducted. I think you were misguided and conspired with your boyfriend first to cover up his actions towards your child and then to conspire with him to conceal the cause of death of the child and to defeat successful prosecution arising out of that death by conspiracy of silence. I think you knowingly and intentionally did participate in that conspiracy of silence.
The judge also stated, "I understand why the jury could have responded the way they did on the facts of this case" and noted that, "I believe that while you are not innocent of your child's death that you shouldn't spend the rest of your life in prison for your role in this."
The judge then granted Tensley's post verdict judgment of acquittal and reduced the jury verdict to manslaughter "based on the same legal principles of cruelty to a juvenile." Following the hearing, the judge issued supplemental written reasons for his judgment, expressly finding that the jury verdict did not support the murder conviction, but only manslaughter because Tensley's conduct did not rise to the level of intent required to support a life sentence, and that applying the life sentence in this case would be unconstitutionally excessive.
As set forth above, second degree murder is defined as the killing of a human being when the offender is engaged in the perpetration of cruelty to juveniles, even though she has no intent to kill or inflict *240 great bodily harm. The trial court's ruling based upon the lack of intent was error. Because we find the evidence sufficient to support Tensley's second degree murder conviction, we conclude that the trial judge had no legal grounds to grant Tensley's post verdict judgment of acquittal and reduce her conviction to manslaughter.
III. Conflict of Interest
On appeal, both defendants argue that their rights to conflict-free counsel were violated when Falcon's trial counsel, Jay Nolen, who at one time represented both defendants, was not required to withdraw from representing Falcon. At trial, Nolen cross-examined Tensley, his former client. Falcon argues that his counsel's ability to protect his interest was compromised by his counsel's former representation of Tensley. Tensley argues that her rights were violated by her former counsel's continued representation of Falcon, and his eventual cross-examination of her at trial.
In this matter, on June 27, 2003, attorneys of the Indigent Defender Board, Louis Scott and Nolen, were appointed to represent Tensley. In early 2004, both attorneys were also appointed to represent Falcon.
In June 2004, Scott sought to withdraw from his representation of Falcon. Specifically, Scott alleged that he had "talked to Tensley, but [had] not yet talked to Kevin Falcon." Scott further alleged that "[a]lthough Tensley has not accused Falcon of the murder, it appears that it will be a conflict for counsel to represent both parties, since they are both accused of the same crime and it will be necessary for counsel to attempt to determine if Falcon is guilty in order to properly represent Tensley." Scott finally noted that if he talked to Falcon, "it may be necessary to withdraw from both cases." A subsequent order relieved Scott of his representation of Falcon on July 28, 2004.[1]
The record does not contain a similar motion by Nolen for withdrawal from his representation of Tensley. Nevertheless, the minutes reflect that Nolen was removed as Tensley's counsel on November 17, 2005.
Immediately prior to trial, on December 5, 2005, Tensley's counsel, Scott, filed a motion to remove Nolen as Falcon's counsel. In the motion, Scott alleged that Nolen spoke to both defendants during his representation of them. Scott urged that Nolen's continued representation of Falcon resulted in a "conflict of interest under Rule 1.7 of the Rules of Professional Conduct." Scott further argued that Nolen "cannot represent Kevin Falcon when he has represented both parties and received confidential information from both parties."
On December 5, before jury selection began, the trial court conducted a hearing on the motion to remove counsel. At that hearing, Nolen never agreed that he had a conflict of interest affecting the rights of either Tensley or his remaining client, Falcon, and Nolen was called to testify. Both Scott and Perkins conducted direct examination of Nolen and the state cross-examined him. Nolen testified that he had originally been appointed to represent both Falcon and Tensley. He estimated that during his representation of both defendants, he spoke with each approximately four times in jail and once or twice in the courtroom. He took recorded statements from both defendants. Surprisingly, with no objections from Nolen or either defendant, Nolen discussed the substance of his clients' defenses, indicating that each *241 defendant denied killing the child and that they did not believe that the other defendant had done so. According to Nolen, each admitted that the child was in their custody and that each defendant properly cared for the child. On the other occasions when he spoke with the defendants, Nolen recalled that each reiterated their innocence of the child's death. He did not recall that either defendant made statements which would exonerate or cast guilt upon the other.
After considering Nolen's testimony, the trial court denied Tensley's motion to have Nolen removed as Falcon's counsel. The record reflects, and statements by the trial court indicate, that the court was never informed during the arguments for Nolen's removal that Tensley intended to testify at trial.
When Tensley testified at trial, Nolen cross-examined her. In this cross-examination, she admitted telling Detective Heath she did not believe Kevin hurt the child because he had always been there. She claimed, however, she did not tell Detective Heath that the night before the child was rushed to the hospital she went to bed at 10:00 p.m. and left the child in Falcon's care. She admitted she knew of the "knots" in the child's legs and had soaked him in warm water and rubbed him with alcohol upon Kevin's advice.
Nolen questioned Tensley regarding Falcon's actions from January through April of 2003. Tensley denied that Falcon spent more than one night away from their apartment during that time. Overall, Tensley maintained that Falcon did not harm the child.
The Louisiana Rules of Professional Conduct provide relevant to the duty a lawyer owes to his former client as follows:
Rule 1.9. Duties to Former Clients
(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
(1) whose interests are materially adverse to that person; and
(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.
(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.
An attorney must preserve the confidences of one who has employed him. United States v. Edwards, 39 F.Supp.2d 716 (M.D.La.1999). The Edwards case involved a conflict of interest concerning a Louisiana criminal defense attorney wherein the court reviewed extensively the implications of Rule 1.9 of the Louisiana *242 Rules of Professional Conduct. This obligation continues even after termination of the attorney-client relationship. Id. This duty of confidentiality is broader than the evidentiary attorney-client privilege and applies not only to matters communicated to the attorney in confidence by the client, but to all information relating to the representation, whatever its source. Not only should an attorney preserve the confidences and secrets of his client, but the attorney should always avoid even the appearance of impropriety in doing so. Furthermore, the attorney should not place himself in a position where there may be the temptation to take advantage of information derived from confidential communications. A court, in the exercise of its duty to supervise members of its bar, has a duty to support the strong public interest in preserving client confidences and in preserving the integrity of the litigation process. Id.
The Sixth Amendment to the United States Constitution guarantees that "[in] all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI; State v. Cisco, 01-2732 (La.12/3/03), 861 So.2d 118, cert. denied, Louisiana v. Cisco, 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004). To be more than just a hollow right, our law requires that assistance of counsel be effective. As a general rule, therefore, Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant he is representing. Id. The right to counsel secured under the Sixth Amendment includes the right to conflict-free representation. Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).
The issue of conflict-free representation under Holloway arises from joint representation of co-defendants at trial or out of an attorney's representation of both a defendant and a witness. United States v. Morando, 628 F.2d 535 (9th Cir.1980). The right to counsel's undivided loyalty is a critical component of the right to assistance of counsel; when counsel is burdened by a conflict of interest, he or she deprives the client of his Sixth Amendment right as surely as if he failed to appear at trial. Bonin v. California, 494 U.S. 1039, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990). Thus, when an issue of conflict of interest arises, the court must ensure that the conflict is either eliminated or waived. United States v. Santos, No. CR. XX-XXXXX-XX, 2006 WL 2524160 (W.D.La. Aug.29, 2006). So long as an affected party can show that the matters involved in the previous representation are substantially related to those in an action in which the attorney represents an adverse party, the former client is entitled to disqualification of the lawyer. United States v. Kitchin, 592 F.2d 900 (5th Cir. 1979), cert. denied, Kitchin v. United States, 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979), and cases cited therein.
Disqualification of counsel in cases in which an attorney is potentially or actually in a position to use privileged information obtained during prior representation of a client is rooted in notions of fundamental fairness; allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an "unfair advantage." United States v. Ostrer, 597 F.2d 337 (2d Cir.1979); United States v. Escobar-Orejuela, 910 F.Supp. 92 (E.D.N.Y.1995). It is well settled that a fair trial tribunal is a basic requirement of due process. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed.2d 942 (1955). The question of disqualification of counsel *243 therefore implicates not only Sixth Amendment rights of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interest in ensuring a just verdict and a fair trial. United States v. Locascio, 6 F.3d 924 (2nd Cir.1993), cert. denied, 511 U.S. 1070, 114 S.Ct. 1645-46, 128 L.Ed.2d 365 (1994); United States v. Escobar-Orejuela, supra. Thus, the right to due process and a fair trial include the essential element that there is no unfair advantage to the prosecution by reason of a prior professional relationship between a member of its staff and a criminal defendant concerning the same or closely related matter. United States v. LaVallee, 439 F.3d 670 (10th Cir.2006); United States v. Schell, 775 F.2d 559 (4th Cir.1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986). "Such switching of sides is fundamentally unfair and inherently prejudicial. Without question, a client's right to a fair trial, secured by the Due Process Clauses of the Fifth and Fourteenth Amendments, is compromised under those circumstances." United States v. Schell, supra at 565. Likewise, the state has a right to a fair trial. Therefore, any previous relationship by defendant's counsel with a state's witness potentially gives the defendant an unfair advantage. People v. Ortega, 209 Ill.2d 354, 283 Ill. Dec. 530, 808 N.E.2d 496 (2004); People v. Holmes, 141 Ill.2d 204, 152 Ill.Dec. 268, 565 N.E.2d 950 (1990). See also, United States v. O'Malley, 786 F.2d 786 (7th Cir. 1986); United States v. James, 708 F.2d 40 (2nd Cir.1983).
The United States Supreme Court discussed the issue of loyalty and attorney-client privilege in cases of multiple client representation in Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court explained its Cuyler decision and why Cuyler imposes a lower threshold for reversal of a conviction than does Strickland:
One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice [than a case in which the defendant effectively had no counsel]. In Cuyler v. Sullivan, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."
Id. at 692, 104 S.Ct. 2052. "Given . . . the ability of trial courts to make early inquiry in situations likely to give rise to conflicts, . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest." Beets v. Scott, 65 F.3d 1258 (5th Cir.1995), cert. denied, Beets v. Johnson, 517 U.S. 1157, 116 S.Ct. 1547, 13 L.Ed.2d 650 (1996).
From the above jurisprudence, the Louisiana Supreme Court has consistently held that a defense attorney required *244 to cross-examine a current or former client on behalf of a current defendant suffers from an actual conflict. State v. Cisco, supra at 130. An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties. State v. Carmouche, 508 So.2d 792 (La.1987). If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant is sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client. State v. Kahey, 436 So.2d 475 (La.1983).
If such an actual conflict exists, it need not be shown that the divided loyalties actually prejudiced the defendant in the conduct of his trial. Zuck v. Alabama, 588 F.2d 436 (5th Cir.1979), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). The court in Zuck noted that:
The analysis in conflict of interest cases does not focus on the actual effect of the conflict on a particular defendant's case. Rather, the basis of these decisions is the belief that a defendant may not be represented by counsel who might be tempted to dampen the ardor of his defense in order to placate his other client. That fact that a particular lawyer may actually resist that temptation is of no moment. The right to effective assistance of counsel is so vital to a fair trial that courts are compelled to examine every potential infringement of that right with the most exacting scrutiny. Determining whether the particular attorney has yielded to the temptation a conflict presents requires a searching analysis of his performance at trial. A cold, dispassionate appellate transcript simply cannot provide an adequate basis for assessing such a performance, for subtle variations in demeanor and depth of cross-examination cannot be reflected in the pages of a transcript . . . A defense attorney must be free to use all his skills to provide the best possible defense for his client. . . .
588 F.2d at 440.
In State v. Cisco, supra, an actual conflict was found to exist and the court found that the trial court was sufficiently alerted to the attorney's conflict of interest prior to trial. If an objection to the conflict of interest had not been raised until after trial, the defendant would have been required to show on appeal that he was prejudiced by his counsel's conflicted ineffective actions or inactions. Since that was not the case in Cisco, prejudice which the defendant may have experienced at trial was not the test. The court instead applied the rule that when the objection to a possible conflict is raised pretrial, the trial court must appoint separate counsel or determine if the claimed conflict is too remote. Id. at 130. Furthermore, if an actual conflict exists and is recognized prior to trial, a defendant may be allowed to waive his right to effective assistance of counsel. Before a defendant can knowingly and intelligently execute a valid waiver of conflicted counsel he must be told (1) that a conflict of interest exists; (2) the consequences to his defense from continuing with conflict-laden counsel; and (3) that he has a right to obtain other counsel. Id. at 133.
Upon the appointment of both Scott and Nolen to represent both defendants during the initial phase of the prosecution, our express law, the canons of ethics and the above jurisprudence all recognized a significant potential for conflict. La.C.Cr.P. art. 517 provides:
A. Whenever two or more defendants have been jointly charged in a single *245 indictment or have moved to consolidate their indictments for a joint trial, and are represented by the same retained or appointed counsel or by retained or appointed counsel who are associated in the practice of law, the court shall inquire with respect to such joint representation and shall advise each defendant on the record of his right to separate representation.
B. Unless it appears that there is good cause to believe that no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.
Although Article 517 was erroneously not followed in this case, Scott soon recognized, at least in part,[2] the conflict and withdrew from representation of Falcon, claiming that he had never consulted with Falcon. Nolen also was dismissed from representation of Tensley before trial.
The trial court was specifically alerted to the conflict by Tensley's pretrial motion to have Nolen removed as Falcon's counsel. Although Rule 1.7 of the Louisiana Rules of Professional Conduct[3] was cited by Scott as the basis for the attorney's conflict of interest, the more specific provision, Rule 1.9, supra, prohibited Nolen from representing "another person in the same . . . matter" in which he had admittedly obtained confidential communications from a former client/co-defendant whose interests could be clearly adverse to Nolen's present client.
The first step in the process after the pretrial recognition of a conflict is to test the conflict for its remoteness to the present action. State v. Cisco, supra. In this action, the conflict was directly present. The conflict did not involve another matter of the attorney's legal representation that was only tangentially related to the present matter. It involved the dual representation of parties to the very crime at hand. If unrecognized, the conflict could require that Nolen cross-examine a former client who had confidentially communicated to him evidence of the crime at hand. Nevertheless, a hearing, presumably to test for remoteness, began in which Nolen, without objection from himself or any other lawyer in attendance, revealed communications substantially bearing on the defenses of his former and present clients. The conflict was not remote. No hearing was necessary. There was an actual conflict which implicated the Sixth Amendment right to counsel and the rights to due process and fair trial for both defendants.
The actual conflict of interest as it relates to Tensley did not directly involve her trial attorney, who arguably provided conflict-free counsel.[4] Tensley therefore is not contesting that her constitutional right to counsel was violated with regard to Scott's representation of her at trial. Nolen, however, was Tensley's appointed counsel in the early stages of the prosecution. *246 Nolen was allowed to switch clients and take an adversarial role against Tensley's interest since effective counsel for Falcon would necessarily raise, at least circumstantially, facts emphasizing the mother as dominant custodian for the child's care. This conflict culminated in the ghastly unrestrained process of Tensley's cross-examination by Nolen at trial. The above jurisprudence has recognized such process as fundamentally unfair and prejudicial in violation of Tensley's right to due process. Her conviction is reversed.
Regarding waiver of the conflict, it is clear that Tensley sought only Nolen's dismissal as Falcon's counsel and would not waive the continuation of Nolen's participation in the case. Falcon, on the other hand, did not directly move for conflict-free counsel. However, as recognized in State v. Cisco, supra, "[b]efore a defendant can knowingly and intelligently execute a valid waiver of conflicted counsel, he must be told (1) that a conflict of interest exists; (2) the consequences to his defense from continuing with conflict-laden counsel; and (3) that he has a right to obtain other counsel." Id. at 133. The actual conflict laid before the trial court in the pretrial motions and hearing required the trial court to advise Falcon that a conflict of interest existed. Falcon was never advised of his right to obtain conflict-free counsel and his conviction also must be reversed.

Conclusion
The conflict of interest concerning the attorney's prior representation of the defendants violated the constitutional rights of both defendants. These violations require that their convictions for second degree murder be reversed. The case is remanded to the district court.
REVERSED AND REMANDED.

APPLICATION FOR REHEARING
Before BROWN, CARAWAY, PEATROSS, MOORE and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] The order shows that W. Lee Perkins was then appointed to represent Falcon. He remained Falcon's co-counsel with Nolen through trial.
[2] Scott's remaining in the case after having been appointed as Falcon's counsel remains problematical in view of that representation, the extent of which has not been completely explored.
[3] Rule 1.7 provides:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
[4] However, see footnote 2, supra.